**PINNEY DOCK AND TRANSPORT CO., Plaintiff-Appellant (84–3653), Plaintiff-Cross Appellee (84–3654),**

**and**

**Litton Industries, Inc.; Litton Systems, Inc.; Litton Great Lakes Corp.; and Erie Marine, Inc., Plaintiffs-Appellees (84–3876), Plaintiffs-Cross Appellants (84–3877),**

**v.**

**PENN CENTRAL CORP.; the Chessie System Co.; N & W Railway Co.; NWS, Inc.; and Bessemer & Lake Erie Railroad Co., Defendants-Appellees (84–3653), Defendants-Cross Appellants (84–3654), Defendants-Appellants (84–3876), Defendants-Cross Appellees (84–3877),**

**Chesapeake & Ohio Railroad Co.; Baltimore & Ohio Railroad Co.; and CSX Corp., Defendants-Appellants (84–3876), Defendants-Cross Appellees (84–3877).**

Nos. 84–3653, 84–3654, 84–3876 and 84–3877.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 29, 1985.

Decided Feb. 3, 1988.

Rehearing and Rehearing En Banc Denied April 13, 1988.

Richard T. Colman, argued, Robert G. Abrams, Thomas N. Heyer, Howrey & Simon, Washington, D.C., Harry C. Nester, Hahn, Loeser, Freedheim, Dean and Wellman, Cleveland, Ohio, for Pinney Dock & Transport and Litton.

Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, New York City, for Penn Central.

Richard J. Flynn, argued, Stephen S. Hill, Sidley & Austin, Washington, D.C., R. Merinda Wilson, Thomas H. Yancey, for Norfolk & Western Ry.

Kenneth C. Anderson, Lead Counsel, Squire, Sanders & Dempsey, Washington, D.C., Sean F. Boland, James V. Dick, Timothy W. Bergin, for Bessemer & Lake Erie R. Co.

Anthony J. Celebrezze, Jr., Atty. Gen. of Ohio, Kenneth James, Doreen C. Johnson, Columbus, Ohio, amicus curiae—State of Ohio.

William C. Leiper, John D. Morrison, Monroeville, Pa., for Bessemer & Lake Erie R.R. Co.

Lawrence R. Velvel, Memel, Jacobs, Pierno, Gersh & Ellsworth, Bruce J. Ennis, Ennis, Friedman, Bersoff & Ewing, Washington, D.C., amicus curiae for C.D. Ambrosia Trucking Co., David W. Reaney, Reaney Dock Co.

John Doar (Lead Counsel) John Doar Law Offices, New York City, Stephen J. Pollak, Richard T. Conway, Stephen J. Hadley, Shea & Gardner, Washington, D.C., for Baltimore & Ohio R.R., Chesapeake & Ohio Ry. & CSX Corp.

Dónald L. Flexner, Richard McMillan, Jr., Crowell & Moring, Washington, D.C., for other petitioners.

Before ENGEL and KENNEDY, Circuit Judges, and HIGGINS,[*] District Judge.

ENGEL, Circuit Judge.

These consolidated antitrust cases are before the court pursuant to 28 U.S.C. § 1292(b) after a panel of this court granted permission on August 14, 1984 to appeal several orders of the United States District Court for the Northern District of Ohio.

Plaintiffs originally commenced these separate actions in district court, seeking treble damages and injunctive relief for injuries to their business and property allegedly caused by defendants' violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; section 3 of the Clayton Act, 15 U.S.C. § 14; and parallel provisions of Ohio's antitrust laws under the Valentine Act, Ohio Rev.Code §§ 1331.01–02, 1331.04, 1331.06, 1331.08, 1331.12, and 1331.14. Plaintiffs' actions are based on similar allegations that "from at least the mid–1950's" the defendant railroads conspired to restrain trade in, and monopolize, the movement of iron ore by ship across the Great Lakes to docks located on the south shore of Lake Erie, the unloading of these ships at those docks, and the subsequent movement of the ore to steel mills located inland.

The issues certified for interlocutory appeal involve a number of jurisdictional questions, including antitrust immunity under the Interstate Commerce Act, 49 U.S.C. § 10706, application of the *Keogh* doctrine which bars antitrust damage claims in certain situations, exclusive and primary juris-

---

[*] Honorable Thomas A. Higgins, United States District Judge for the Middle District of Tennes- see, sitting by designation.

diction of the Interstate Commerce Commission, standing, statute of limitation/fraudulent concealment under the antitrust laws, and federal preemption of the Ohio antitrust statute of limitations.

## I.

### A. The Parties

The plaintiffs in this consolidated action are Pinney Dock and Transport Company (Pinney) and Litton Industries, Inc., Litton Great Lakes Corporation, and Erie Marine, Inc., (collectively Litton). Pinney provides dock services at Ashtabula, Ohio, for iron ore and other bulk commodities moving over the Great Lakes by ship. For at least part of the time period relevant to these cases, Litton was engaged in the design and construction of large self-unloading vessels and the operation of these vessels, along with conventional bulker vessels, in the movement of iron ore and other commodities over the Great Lakes. In 1974, however, Litton ceased operating such vessels on the Great Lakes.

The defendants are certain railroad companies, including Penn Central Corporation (Penn Central), Baltimore & Ohio Railroad Company (B & O), Chesapeake & Ohio Railway Company (C & O), CSX Corporation, Chessie Systems Company (Chessie), Norfolk & Western Railway Company (N & W), and Bessemer & Lake Erie Railroad Company (B & LE).[1] The defendant railroad companies are all engaged in the business of providing common carriage of goods and commodities by rail to or from Lake Erie docks. In addition, each of the railroad companies owns or has owned, was affiliated with, or operated one or more of these Lake Erie docks.

### B. Historical Background

Pursuant to its authority under the Interstate Commerce Act,[2] the Interstate Commerce Commission (ICC) has for many years regulated the rates set by railroads for the common carriage of goods and commodities by rail to and from Lake Erie. *See Iron Ore Rate Cases,* 44 I.C.C. 181 (1916), *as supplemented,* 44 I.C.C. 368 (1917). Under the Act, the carriers themselves initiate rates and include them in tariffs which must be filed with the ICC. 49 U.S.C. § 10762(a)(1).[3] Unless and until suspended, set aside or disapproved, these rates become the lawful rate as between carrier and shipper.[4]

---

1. Pursuant to Rule 27(a) of the Local Rules of this court, and the order of the district court of May 23, 1985, we entered an order on June 5, 1985 dismissing from Nos. 84–3653 and 84–3654 B & O, C & O and CSX, collectively referred to as the "Chessie defendants," the parties having reached a settlement.

2. The initial Act to Regulate Commerce was enacted in 1887. Ch. 104, 24 Stat. 379. Its successor, the Interstate Commerce Act, as amended, was subsequently codified at 49 U.S.C. §§ 1–66. These and related provisions were repealed and recodified by Act of Oct. 17, 1978, Pub.L. No. 95–473, 92 Stat. 1337, and are currently codified in scattered sections of 49 U.S.C. §§ 10101–11917. Although this recodification was not intended to effect any "substantive change," *see* § 3(a), 92 Stat. 1337, 1466, it substantially revised the language and structure of the Act. The parties have cited the old version of the Act, but we have cited the current version.

 For a good overview of the Interstate Commerce Act, including subsequent amendments, and its relationship to the antitrust laws, see Dempsey, *Rate Regulation and Antitrust Immunity in Transportation: The Genesis and Evolu-*

*tion of this Endangered Species,* 32 Am.U.L.Rev. 335 (1983).

3. A tariff is a filed publication in which a carrier states its rates and charges and which may include rules governing other related services. *See* Rosenak, *Rate Procedures and Proceedings,* 12 Transp.L.Inst. 1, 1 (1979).

4. Once a proposed tariff is filed with the ICC, the Commission has a limited time within which to suspend or reject the tariff. During this notice period the ICC may suspend the tariff either on its own motion or on the motion of an interested party. 49 U.S.C. § 10707(a). If the ICC fails to reject the proposed tariff within the applicable notice period the tariff automatically becomes effective. 49 U.S.C. § 10707(b). After a rate becomes effective, the Commission can still investigate violations of the Act and compel compliance with the Act. *Id.* § 11701(a). Judicial review of the ICC's decision under these proceedings is also available but subject to certain limitations. Thus, a decision by the Commission following a § 10707(a) investigation to approve or disapprove a set of rates is a judicially reviewable final decision as is a decision to approve or disapprove a set of

In setting rates under the Act, a carrier may provide interstate transportation services only at the rate specified and the tariff filed with the ICC. *Id.* § 10761. In addition, a carrier is strictly prohibited from charging any person a different rate for a "like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances." *Id.* § 10741(a). These provisions reflect one of the preeminent purposes of the Act: the prevention of unjust discrimination in interstate commerce.[5] Differences in rates, classifications, rules, or practices, however, do not violate the anti-discrimination provisions of the Act if they reflect substantive differences in services performed.

Under the Interstate Commerce Act, rail carriers have long been permitted to act jointly in setting rates despite the potential for antitrust liability. Indeed, although the Interstate Commerce Act of 1887 was silent on the issue of collective ratemaking, the ICC condoned the practice even after the enactment of the federal antitrust laws. *See In re Trans-Continental Freight Bureau,* 77 I.C.C. 252 (1923).[6] Beginning in the 1940's, however, the Department of Justice began enforcing the antitrust laws against related common carriers. In 1944,

the State of Georgia brought an action against 21 railroads alleging rate discrimination, antitrust violations and price fixing. This suit culminated in *Georgia v. Pennsylvania Railroad,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), in which the Supreme Court held that a conspiracy "to use coercion in the fixing of rates and to discriminate against Georgia in the rates which are fixed" stated a cause of action under the antitrust laws. *Id.* at 462, 65 S.Ct. at 728. In so holding, however, the Court emphasized that the State could not directly challenge the continuance of any tariff, since such an action would be within the jurisdiction of the ICC.

Congress responded to this decision in 1948 with the Reed-Bulwinkle Act.[7] This Act specifically authorizes rate bureaus to agree collectively upon "rates ..., classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them...." 49 U.S.C. § 10706(a)(2)(A). This Act further provides that parties to an ICC-approved rate agreement are exempt from the antitrust laws with respect to making and carrying out the agreement. 49 U.S.C. § 10706(a)(2)(A).[8] In addition to the qualified immunity under the Reed-Bulwinkle Act, the *Keogh* doctrine[9] has long

---

rates following a § 11701(a) investigation. In addition, although a decision *not* to investigate the lawfulness of a proposed rate schedule under § 10707(a) is *not* reviewable, an interested party may require the Commission to "investigate the lawfulness of any rate at any time—and may secure judicial review of any decision not to do so—by filing a § [11701(a)] complaint." *Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979).

5. See *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915):

Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable.... This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Id.* at 97, 35 S.Ct. at 495.

6. This collective ratemaking was, and continues to be, effected through rate bureaus, which are associations of two or more carriers that disseminate information regarding the rates to be charged for various services by participating rate bureau members. *See* Dempsey, *supra* note 2, at 354.

7. Pub.L. No. 80–662, 62 Stat. 472 (1948) (originally codified at 49 U.S.C. § 5b, and currently codified at 49 U.S.C. § 10706).

8. Although the Reed–Bulwinkle Act has been substantially amended by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94–210, 90 Stat. 31 (1976), there is no claim that this amendment is applicable to the facts of the instant case.

9. The *Keogh* doctrine was announced in *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), and recently reaffirmed in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

protected carriers from antitrust damages based on alleged discriminatory rates which have been approved by the ICC.

Although these protections from the antitrust laws are considerable, an aggrieved party is not without a remedy for injuries inflicted in violation of the Act. The Act permits any person to bring a complaint at any time for violations of the Act. The Commission must investigate the complaint unless the complaint "does not state reasonable grounds for investigation and action." 49 U.S.C. § 11701(b). Also, a person injured by a violation of the Act can seek damages in a civil action or in a proceeding before the ICC. *Id.* § 11705. In addition to these private remedies, a carrier which willfully violates the Act may be subject to various penalties, fines, and civil damages, as well as other equitable relief, which may be sought by the Government. *Id.* §§ 11703, 11901–11907.

### C. Factual Background

The defendant railroads in the instant case formed a rate bureau and entered into a collective ratemaking agreement shortly after the passage of the Reed-Bulwinkle Act. This agreement was subsequently approved by the ICC in 1950 pursuant to 49 U.S.C. § 5b (now codified at 49 U.S.C. § 10706). *See Eastern Railroads—Agreements,* 277 I.C.C. 279 (1950). No challenge is made here to the original agreement or to the defendants' right collectively to set rates pursuant to the terms and conditions of this agreement. Rather, plaintiffs challenge an alleged anticompetitive conspiracy which, plaintiffs contend, was formulated outside the scope of the agreement and in response to the emergence of self-unloaders and the threat they posed to defendants' control of the dock unloading and land transportation business. According to plaintiffs:

> Historically, iron ore had been carried across the Lakes in "bulker" vessels, which had to be unloaded by shore-side cranes, called huletts. Defendants owned all of the docks equipped with huletts, and their docks were exclusively used for unloading bulkers. Defendants collected "handling charges" for unload-

ing bulkers and "line-haul rates" for carrying ore from their lake front docks to inland steel mills. By use of a conveyor system built into a self-unloading vessel, these boats could unload without the assistance of huletts. Self-unloaders threatened to render obsolete defendants' investment in huletts, and elevated the competitive importance of non-railroad docks such as Pinney because they were not incumbered by huletts and were ideally suited for self-unloaders. To eliminate the competitive threat of non-railroad docks and to monopolize the dock handling business, defendants, *inter alia* assessed the bulker handling charge to self-unloaders even though no unloading services were performed, thereby eliminating the primary economic incentive to develop self-unloaders, and refused to publish a commodity line-haul rate from Pinney for the movement of iron ore, thereby eliminating the economic incentive to use Pinney instead of defendants' docks.

> Litton entered the Great Lakes transportation market in the mid–1960's and embarked on a venture to construct and operate large, technologically advanced self-unloading vessels. Litton's venture was frustrated by defendants' efforts to exclude self-unloaders and non-railroad dock competition and by defendants' concerted refusals to deal with Litton. In particular, defendants refused to cooperate with Litton in developing an unloading dock facility and refused to sell or lease dock space to Litton. Defendants' boycott of Pinney prevented Litton froin using Pinney even though Pinney was capable of handling Litton's large self-unloaders. As a result, Litton withdrew from the market after constructing only two vessels.

According to plaintiffs, therefore, it was in response to this competitive threat posed by the development of self-unloaders that the defendants entered into a new and separate agreement and took actions pursuant to this agreement "from at least the mid–1950's," all of which plaintiffs alleged were outside the permissible bounds and protec-

tion of the original ICC approved agreement of 1950.

### D. The Parties' Allegations

In its amended complaint, Pinney's principal allegation is that the defendants conspired to restrain trade in, eliminate competition in, and monopolize the business of providing both dock services for iron ore and other goods moving over docks on the lower Great Lakes and water carriage for iron ore moving to the same docks. Pinney alleges that the defendants accomplished their illegal purposes by engaging in secret meetings, by refusing to grant non-railroad owned docks, such as Pinney, a competitive rail rate (i.e., a commodity line-haul rate), by arbitrarily placing Pinney in a switching district where it would be ineligible for rail rates competitive with those available at railroad owned docks, by imposing an arbitrarily and unjustifiably high switching charge on cars of a railroad competitor which sought to carry iron ore from Pinney Dock at competitive rail rates, by intentionally impeding the construction and use of self-unloading vessels through the imposition of artificial, arbitrary, and unjustifiably high dock handling charges on such vessels and thereby foreclosing Pinney Dock's development as an iron ore handling facility, and by forcing railroads to forgo their right to independent action with respect to rail rates and services and other matters.[10]

Pinney alleges that as a result of the defendants' acts and violations, it was injured in its business and property because it was "forestalled and excluded from participating in the business of providing dock services for various commodities, including iron ore, coal and coke." Pinney seeks to recover damages based on the amount of business it lost as a result of the defendants' efforts to drive it out of the iron ore business. They state that "[o]ne way to calculate the amount of business Pinney lost is to determine the amount of iron ore Pinney would have handled absent defendants' conspiracy and multiply that amount

by the charges Pinney would have assessed for handling the ore." Pinney also claims that it was injured in its business by the defendants' assessment of bulker handling charges to self-unloaders, which, according to Pinney, was intended to impede the development and operation of such vessels, vessels which Pinney claims it was uniquely capable of handling.

Litton's damage claims are in many respects similar to those of Pinney. Litton's principal allegation is that the defendants conspired to restrain trade in, eliminate competition, and monopolize the business of providing dock services for iron ore and other bulk commodities moving over the docks on the Great Lakes, and also conspired to restrain and suppress trade in the business of carrying iron ore and other bulk commodities in self-unloading and certain bulker vessels moving on the Great Lakes. Litton also claims that the defendants conspired to foreclose and prevent Litton from developing, selling, or chartering, or using technically advanced vessel, dock and related products and services.

Litton asserts that the defendants accomplished these illegal purposes by continuous secret meetings, by refusing to permit Litton to purchase, lease or use dock facilities which could have accommodated self-unloading vessels, by refusing to handle self-unloading vessels, by taking affirmative action to prevent non-railroad controlled docks from handling bulk commodities transported in self-unloading vessels, by arbitrarily placing unjustifiably high dock handling charges on iron ore discharged from self-unloading vessels, and by forcing railroads to forego their right of independent action. Litton claims that as a result of the defendants' acts and violations, it was forced to cease the design, construction, sale and charter of its advanced self-unloading vessels, the operation of its self-unloading and bulker vessels for the transportation of iron ore and other bulk commodities, and prevented in its efforts to secure and operate dock facilities.

---

**10.** In paragraph 18 of its amended complaint, Pinney incorporates by reference and realleges, with respect to coal and coke shipments, the allegations and claims regarding iron ore shipments as set forth in paragraph 13 of the amended complaint.

Litton claims that, as a result, it was forced to withdraw from the Lake Erie transportation market in 1974.

### E. History of the Proceedings

Pinney filed its complaint on September 17, 1980, and a first amended complaint on October 8, 1980, in the United States District Court for the Northern District of Ohio. Litton filed its complaint on March 5, 1981. After extensive discovery was taken, defendants filed a number of motions for summary judgment seeking to dismiss all or some of plaintiffs' claims on jurisdictional grounds. When this onslaught was concluded, United States District Judge Thomas had issued over six rulings consisting of over 500 pages of written memoranda and orders.

In the first two opinions, issued June 21, 1983, Judge Thomas denied defendants' summary judgment motions in *Pinney*. In the first opinion, Judge Thomas rejected each of the defendants' five grounds for dismissal of Pinney's claims: (1) express immunity from antitrust liability under the Reed-Bulwinkle Act; (2) immunity from antitrust damages under the *Keogh* doctrine; (3) exclusive jurisdiction of the Interstate Commerce Commission; (4) primary jurisdiction of the Interstate Commerce Commission; and (5) lack of standing to raise certain claims. *Pinney Dock & Transport Co. v. Penn Central Corp.*, 600 F.Supp. 859 (N.D. Ohio 1983). In the second opinion, Judge Thomas denied defendants' motions for summary judgment on Pinney's claims which predate the four-year statute of limitations under section 4B of the Clayton Act, 15 U.S.C. § 15b. In denying the motions, Judge Thomas held that there was a genuine issue of fact whether the fraudulent concealment exception under *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975), tolled the statute of limitations. *Pinney Dock & Transport Co. v. Penn Central Corp.*, 1983–2 Trade Cas. (CCH) ¶ 65,608 (N.D. Ohio 1983). Defendants thereafter moved for reconsideration, or certification of these issues for interlocutory appeal. On March 29, 1984, Judge Thomas again fully analyzed defendants' arguments and reaffirmed the June 21, 1983, decision on exclusive jurisdiction, express immunity and standing. The court also directed Pinney to respond to its inquiries concerning the possible application of the *Keogh* doctrine and primary jurisdiction.

On May 10, 1984, the court reaffirmed its June 21, 1983, decision on *Keogh* and primary jurisdiction, and certified both of its *Pinney* decisions for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted defendants' petition to appeal on August 8, 1984.

On October 4, 1984, Judge Thomas issued an exhaustive written Memorandum and Order in *Litton* denying defendants' motions for summary judgment on statute of limitations grounds. The court held that the legal principles relied upon in the *Pinney* statute of limitations opinion were equally applicable in *Litton* and further found that the facts of *Litton* raised a genuine issue of fact of fraudulent concealment by the defendants. In addition, after finding the jurisdictional issues in *Litton* virtually the same as in *Pinney*, the court, on October 5, 1984, adopted its holding in *Pinney* on all issues except standing, which defendants had not challenged. Judge Thomas also certified the *Litton* rulings pursuant to section 1292(b) for interlocutory appeal. On October 25, 1984, a panel of this court granted defendants' petition for leave to appeal the interlocutory orders and consolidated the *Pinney* and *Litton* appeals for briefing and oral argument.

On February 2, 1982, Judge Thomas had also denied defendants' motions for summary judgment to dismiss Pinney's pendent state claims under Ohio's Valentine Act. Although the court sustained pendent jurisdiction, the court noted that an issue was raised as to whether the four-year statute of limitations governing federal antitrust actions, 15 U.S.C. § 15b, preempts Ohio Rev.Code § 1331.12, which provides that no statute of limitations shall bar claims under the Valentine Act. At the court's invitation, the parties submitted briefs on this issue. On October 1, 1982, Judge Thomas issued a written Memorandum and Order,

finding that the statute of limitations provision under the Valentine Act was preempted by federal law. The court therefore held that Pinney's pendent antitrust claims under the Valentine Act were subject to the Clayton Act's four-year statute of limitations. *See Pinney Dock & Transport Co. v. Penn Central Corp.*, 1982–83 Trade Cas. (CCH) ¶ 65,053 (N.D. Ohio 1982). On May 10, 1984, Judge Thomas again considered the preemption issue and reaffirmed his original decision. The court also certified this issue for interlocutory appeal pursuant to section 1292(b). On August 8, 1984, this court granted Pinney's petition for interlocutory appeal.

On October 4, 1984, Judge Thomas issued a written Memorandum and Order in the *Litton* case adopting his October 1, 1982, preemption ruling in the *Pinney* litigation. Judge Thomas also certified this order for interlocutory appeal pursuant to section 1292(b), and, on October 25, 1984, this court granted Litton's petition to appeal and consolidated *Pinney* and *Litton* for briefing and oral argument.

Judge Thomas' meticulous care and scholarship have been immensely helpful to the parties and to us.

On appeal, defendants have challenged virtually every ruling of the district court. Defendants argue that the district court erred in finding that they are not expressly immune from antitrust liability under the Interstate Commerce Act; that the court erred in finding that the *Keogh* doctrine does not bar plaintiffs' antitrust damage claims; and that the court erred in finding that the matters at issue are not within the exclusive jurisdiction of the ICC. The defendants also contend that the district court's refusal to refer certain issues to the ICC under the doctrine of primary jurisdiction was erroneous. The defendants further argue that both Pinney and Litton lack

standing to seek antitrust relief for certain claims. Finally, the defendants contend that the district court erred when it applied the doctrine of fraudulent concealment to toll the Clayton Act's four-year statute of limitations. Pinney and Litton, joined by the State of Ohio as amicus, also challenge the district court's ruling that the four-year statute of limitations governing federal antitrust actions preempts the statute of limitations provision under Ohio's Valentine Act.[11]

## II.

Initially, we address plaintiffs' contention that defendants are attempting to raise issues in this appeal which were not properly certified pursuant to section 1292(b) and which could not have been within the contemplation of the district court when it certified its orders for interlocutory appeal. Specifically, plaintiffs contend that defendants should not be able to raise the issue of primary jurisdiction, nor should defendants be able to challenge Litton's standing. Plaintiffs further contend that issues involving the fraudulent concealment exception to the statute of limitations should not be addressed to the extent that they do not involve "controlling questions of law."

Upon a review of the district court's order of certification in the *Pinney* case, dated May 10, 1984, and the court's order of certification in the *Litton* case, dated October 5, 1984, we find it difficult to determine precisely whether certain issues were certified for interlocutory appeal. The district court concluded that its jurisdictional orders in the *Pinney* and *Litton* cases, its statute of limitations orders in those cases, and its orders relating to the preemption of the Ohio Valentine Act's statute of limitations, involve "controlling question[s] of law for which there is a

---

**11.** Following oral argument, C.D. Ambrosia Trucking Company, Inc., and David W. Reaney and Reaney Dock Company sought leave to file a post-argument amicus brief pursuant to Rule 29 of the Federal Rules of Appellate Procedure. Because of the complexity of this case, and the possibility that the interest of amicus could be affected by the outcome of this case, we granted this motion on January 3, 1986. In disposing of the issues raised in this appeal, we have considered the arguments raised by amicus. Although amicus has raised some arguments which have not been raised by the principal parties to this action, it is sufficient to note that the position of amicus is similar to that of Pinney and Litton.

substantial ground for difference of opinion and that immediate appeal may materially advance the ultimate termination of this litigation," and the court did not elaborate further. In any event we recognize that even those issues not properly certified are subject to our discretionary power of review if otherwise necessary to the disposition of the case. *See Alexander v. Aero Lodge No. 735, Intern'l. Ass'n,* 565 F.2d 1364, 1370 (6th Cir.1977); 9 Moore's *Federal Practice* ¶ 110.25[1] at 270 (2d ed. 1987). Accordingly, we address only those issues necessary to the disposition of this case and to the extent this opinion is construed not to address an issue, that issue is, for the purposes of this appeal, decertified.

### III. *KEOGH*

Defendants argue that *Keogh v. Chicago & N.W. Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 65 L.Ed. 183 (1922), bars the claims that unreasonable freight and handling charges caused plaintiffs to lose business.

The plaintiff in *Keogh,* a shipper of commodities, sued for antitrust damages on the ground that the defendant railroads restrained competition by conspiring to fix rates for shipment by rail. The ICC had approved the rates as reasonable and non-discriminatory. The plaintiff claimed damages for the difference between these rates and earlier, lower rates that he alleged would have remained in effect if not for the conspiracy. The Supreme Court held that the plaintiff did not have a cause of action.

The Court listed four reasons for its holding. First, the Court observed that when the ICC finds a rate to be illegal because it is unreasonably high or discriminatory, the shipper can recover damages under the Interstate Commerce Act. The Court asked rhetorically whether Congress intended for the antitrust laws to provide an additional remedy, suggesting that the Court would not easily infer one. Second, the Court explained that "the paramount purpose" of the Interstate Commerce Act is "prevention of unjust discrimination." *Id.* at 163, 43 S.Ct. at 50. This required that ICC-approved rates be the sole source

of a shippers' rights against a carrier. If a shipper could recover under the antitrust laws for ICC-approved rates, Congress' purpose might be defeated, because the amount recovered would give that shipper an advantage over his competitors. Third, the Court reasoned that an antitrust plaintiff would have to show that the rate that would have prevailed but for the conspiracy would have been approved by the ICC. There was no proceeding in which the ICC could issue an opinion on a hypothetical rate. Finally, the Court said that the plaintiffs' damages were speculative because all shippers paid the same rate and the benefit of a lower rate might have gone to the plaintiffs' customers or to the ultimate consumer. *Id.* at 162–65, 43 S.Ct. at 49–50.

■ Plaintiffs argue, and the district court held, that *Keogh* does not apply because they are defendants' competitors, not customers seeking damages that would give them an advantage over defendants' other customers. Also, the plaintiffs distinguish *Keogh* on the basis that there the plaintiff asked for a rebate from the rates he had paid, whereas here plaintiffs claim damages for loss of business.

The Second and Third Circuits have held that *Keogh* does not apply when the plaintiff is in competition with the defendant. In *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir.1981), the plaintiffs were municipal power companies who bought electricity at wholesale rates from a larger power company, the defendant. The plaintiffs competed with the defendant in selling power to industrial companies in the different municipalities, and the plaintiffs alleged that the defendant tried to squeeze them out of this competition by selling them power at a wholesale price that was higher than the retail price that the defendant charged its industrial customers. The plaintiffs claimed damages resulting from the industrial enterprises' decision to operate outside of the plaintiffs' territories. *Id.* at 927, 934–35. The court held that the discrimination problem of *Keogh* was absent because in *Keogh* the plaintiff's competitors were not represented in the lawsuit, whereas in *City of*

*Groton* the plaintiffs had no competitors other than the defendant. *See id.* at 929–31.

In *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 610 F.2d 1114 (3d Cir.1979), plaintiff Essential was in the business of distributing a telephone answering device called Code-a-Phone. The defendants provided telephone service and also competed with Essential in the distribution of Code-a-Phone. Defendants filed a tariff that required customers who installed an Essential Code-a-Phone to install an additional device as well, which Essential alleged was unnecessary. The tariff did not require customers who bought a Code-a-Phone from defendants to install the additional device. Essential alleged it was the victim of an antitrust conspiracy and claimed damages for loss of business.

The court allowed the claim. The court reasoned that in both *Keogh* and *Essential* the intended beneficiaries of regulation were customers, not competitors of the regulated utility. Thus, the court stated that the *Keogh* rule "has little or nothing to do with [the utility's] duties under the antitrust laws toward its competitors." *Id.* at 1121. Also, the court noted that the plaintiffs did not ask for a rebate from rates paid, as the plaintiff had in *Keogh. Id.* at 1122.

Plaintiffs' argument against extending *Keogh* to competitor suits finds some support in *Square D Co. v. Niagara Frontier Tariff Bureau Inc.,* 760 F.2d 1347 (2d Cir. 1985) (Friendly, J.), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), where the *Keogh* situation was repeated in a suit by the purchasers of truck transportation services. The Second Circuit argued that post-*Keogh* developments undercut all four reasons for the *Keogh* rule. First, the Supreme Court has allowed an antitrust remedy even when a regulatory remedy is available. Second, the existence of class actions can alleviate the danger of a rebate to a single plaintiff. Third, judicial proceedings can be stayed pending a regulatory proceeding to determine whether a hypothetical rate would have been reasonable. Fourth, the Supreme Court has held that a direct purchaser can recover antitrust damages for the full amount of an overcharge, regardless whether he passed part or all of it on to customers. *Id.* at 1352–53. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

The Second Circuit followed *Keogh* but urged the Supreme Court to overrule it. The Supreme Court praised Judge Friendly's opinion as "characteristically thoughtful and incisive" and did not take issue with his description of the developments since *Keogh,* but reaffirmed the *Keogh* rule for the sake of stability in the law.

> [T]he developments in the six decades since *Keogh* was decided are insufficient to overcome the strong presumption of continued validity that adheres in the judicial interpretation of a statute.... We are especially reluctant to reject this presumption in an area that has seen careful, intense, and sustained congressional attention. If there is to be an overruling of the *Keogh* rule, it must come from Congress, rather than from this Court.

*Square D,* 106 S.Ct. 1930–31.

We do not read this deferential language as an adoption of Judge Friendly's rationale, for on its face it is a polite refusal of an invitation. Since the Supreme Court did in fact uphold the ruling in *Keogh* we construe its cited language to be that the *Keogh* rationale, whatever else might be said of it, still commands, in the Supreme Court's view, the support of Congress. Justice Stevens emphasized "*Keogh*'s role as an essential element of the settled legal context in which Congress has repeatedly acted in this area." *Square D,* 106 S.Ct. at 1930.

Furthermore, we do not believe that either *Keogh* or *Square D* was intended to be limited solely to antitrust damage claims brought by shippers. It is true that in both *Keogh* and *Square D* the plaintiffs were shippers, i.e., customers of the defendants,

rather than direct competitors.[12] We may also assume that plaintiffs will not gain a preference over their trade competitors if permitted to recover antitrust damages resulting from the defendants' alleged conspiracy. In our view, however, it does not follow that plaintiffs' action for damages is therefore outside the scope of *Keogh.*

When the ICC approves a rate, including a rate purportedly arrived at under the type of joint rate agreement permitted under Reed-Bulwinkle, it necessarily takes an anticompetitive action. This action is justified by the ICA because the statute assumes that the pro-competition policies of the antitrust laws have been taken into account but also assumes that the ICC possesses and ought to have the power to override those policies in order to further national transportation policy as expressed in the Act. Rates must not only protect against overcharging captive customers but must also keep in mind the economic costs of delivery of the service. Regulation of one aspect inevitably begets regulation of the other. Thus, the ICC is the sole source of the rights not only of shippers, but of the entire public, including competitors. Plaintiffs here had a right under the ICC to complain to the Commission. We should not easily infer that the Reed-Bulwinkle amendments were not intended to extend to competitor's suits. While such actions may be aimed at achieving some of the objectives of the antitrust laws, they nonetheless can be inconsistent with the statutory delegation of power to the Interstate Commerce Commission and with the allowance of joint ratemaking activities as expressly authorized by Reed-Bulwinkle.

We recognize that the anti-discrimination arguments behind the *Keogh* doctrine lose their force in competitor lawsuits such as this. For those who believe that the original reasons expressed in *Keogh* still have some substantive persuasive force, in the face of *Square D*'s expressed reservations, the other reasons in *Keogh,* we observe, still have considerable applicability here.

▉ In sum, we conclude that the *Keogh* doctrine bars the plaintiffs' antitrust damage claims insofar as these claims are based either on the defendants' own handling charges or on the line-haul rate that was applied from Pinney Dock. To the extent that these rates and charges are otherwise unlawful, we believe that plaintiffs must seek whatever remedies are available under the provisions of the Interstate Commerce Act. At the same time, however, at least some of the plaintiffs' claims for antitrust damages appear to be outside the scope of the *Keogh* doctrine. Litton contends that the defendants refused to permit Litton to purchase, lease or use dock facilities which could have accommodated the technologically advanced self-unloading vessels being designed and constructed by Litton. These allegations are plainly not related to the defendants' handling charges or to the commodity line-haul rate applied from Pinney Dock and, to that extent, *Keogh* would not bar antitrust damage claims based on such allegations. Plaintiffs allege that defendants used harassing tactics and spurious challenges to try to forestall legitimate business activities of competitors. To the extent that these alleged acts are unrelated to defendants' rates, any damages suffered therefrom would not be barred by *Keogh.*

▉ Plaintiffs have raised other claims as well, but it is less clear from the face of these claims that they are not rate-related and therefore within the scope of *Keogh.* Plaintiffs contend that defendants refused to handle self-unloading vessels at docks

---

**12.** However, in *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Supreme Court did see fit to apply *Keogh* in a case where Georgia was both a customer and a competitor. The Court noted that "Georgia sues as a proprietor to redress wrongs suffered by it as the owner of a railroad and as the owner and operator of various public institutions." *Id.* at 447, 65 S.Ct. at 721. The Court then stated "[w]e think it is clear from the

*Keogh* case alone that Georgia may not recover damages even if the conspiracy alleged were shown to exist." *Id.* at 453, 65 S.Ct. at 724. While *Georgia* presents a special case because it was decided prior to the passage of the Reed–Bulwinkle Act in 1948, we find the Supreme Court's application of *Keogh* to a competitor to be relevant even under these circumstances. *Georgia* is discussed in greater depth in section IV of this opinion.

owned or operated by defendants and that defendants boycotted Pinney Dock. However, if this boycott or refusal to deal took the form of assessing higher rates and charges, it would again appear that these claims are within the scope of *Keogh*. Plaintiffs also allege that defendants divided markets, but if the effect of such division is the lack of rate competition, *Keogh* again would bar recovery. Rather than requiring outright dismissal of these claims, however, we believe that plaintiffs should be afforded an opportunity on remand to amend their complaint in order to clarify these allegations to state a claim for damages consistent with *Keogh*. We note that this is the approach taken by Judge Friendly in *Square D*, 760 F.2d at 1365, and this ruling was specifically mentioned by the Supreme Court and left undisturbed when it affirmed the Second Circuit decision in *Square D*. 106 S.Ct. at 1930 n. 28.[13]

## IV. ANTITRUST IMMUNITY UNDER THE ICA

Defendants argue that they are immune from antitrust liability for their ratemaking activities because they are parties to the ICC-approved 1950 Eastern Railroad Agreement. The Reed-Bulwinkle Act, which was enacted in 1948[14] as an amendment to the Interstate Commerce Act, gives the parties to an ICC-approved ratemaking agreement immunity from the antitrust laws:

If the Commission approves the agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936, as amended (15 U.S.C. 13, 13a, 13b, 21a) do not apply to

parties and other persons with respect to making or carrying out the agreement. 49 U.S.C. § 10706(a)(2)(A).

The district court held that the immunity in this provision does not cover a conspiracy to eliminate a competitor. *Pinney Dock*, 600 F.Supp. at 878. On appeal the defendants attack the district court's reasoning, while the plaintiffs endorse it and ask this court to uphold it.

■ The district court held that the language of Reed-Bulwinkle excludes anticompetitive conspiracies from the grant of immunity. The court found support in the legislative history for this reading of the statute. First the court considered the meaning of the statutory language:

[T]he issue confronting this court is whether the ICC's approval of the defendants' [ratemaking] agreement operates as either an express or implied approval of a later "agreement" to eliminate a competitor and monopolize a market.

600 F.Supp. at 866–67.

This definition of the issue is correct insofar as it refers to the statutory provision that the parties to a rate agreement are exempt from the antitrust laws "with respect to making" the agreement. This definition protects the defendants from liability for their conduct in making the 1950 Eastern Railroads agreements, however, it does not necessarily protect them from liability for any other agreement, including the alleged anticompetitive conspiracy.

But Reed-Bulwinkle also exempts the parties to a rate agreement from antitrust liability "with respect to ... carrying out the agreement." Thus, if the parties to a rate agreement conform with the agreement when setting rates, they are exempt from antitrust liability.

So long as defendants stay within the framework of the rate agreement and conform their rates to those approved by the

---

**13.** An additional argument which may be equally applicable to competitors and is addressed in *Keogh* and in *Square D* is the speculative nature of any damages. As we have pointed out, their existence necessarily presupposes alternate activity which might have been undertaken by the

plaintiffs but for the allegedly violative conduct of the defendants.

**14.** Pub.L. No. 80–662, 62 Stat. 472 (1948) (current version at 49 U.S.C. § 10706).

Commission, it cannot make a difference that their underlying intent may be anti-competitive. The difficulty with the district court's conclusion is that while it takes into account the exemption for *making* a rate agreement, it is irreconcilable with the exemption for *carrying out* a rate agreement:

> [N]othing in the present record indicates that the ICC ever "approved" or even was aware of defendants' alleged predatory conspiracy to boycott and eliminate plaintiff as a competitor. The 1950 Eastern Railroads Agreement, which merely establishes the procedures for discussing rate matters and reaching rate agreements, cannot be read as impliedly or expressly "approving" such a predatory conspiracy.

600 F.Supp. at 867. Assuming that this reasoning is adequate as far as it goes, it still ignores the reality that the Agreement was only the first, not the last word, in the Acts of the defendants which it contemplated. It was the establishing of rates which was the purpose of the Agreement, and it is the rates and the incorporated provisions concerning their application which lie at the heart of plaintiff's complaint. It is difficult if not impossible to contemplate how the railroads could establish rates under the Agreement without communication with one another and even more difficult to hypothesize how such communication, in an area which is undeniably anti-competitive even in its effect, could not always be construed as capable of anti-competitive motivation.

■ Therefore, the challenged activities must be measured against the fact that concerted activity was contemplated by the Commission in its original recognition of the 1950 Agreement. The real issue is whether in such circumstances the task is one of determining if the defendants' conduct was within the framework of permissible activity condoned by the Commission's approval of the Agreement. It is asserted that much of the evidence in this case will concern private communications among the alleged conspirators and allegations of the withholding of certain exchanges from the plaintiffs. Such contentions, however,

seem to us to be inextricably intertwined with the question of whether the 1950 Agreement itself was violated, a question which should be addressed, at least first, to the wisdom and expertise of the ICC.

■ The district court also held that the legislative history of Reed-Bulwinkle shows that Congress intended to exclude anticompetitive conspiracies from the antitrust exemption. The court inferred this from legislative history indicating that Reed-Bulwinkle left intact the Supreme Court's decision in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). 600 F.Supp. at 871, 873–74. We are unable to agree.

In *Georgia*, the State of Georgia sued several northern and southern railroads under the antitrust laws. Georgia alleged that the railroads conspired to fix rates in a manner that prevented her shippers and sellers from gaining access to national markets. Georgia also alleged that the northern railroads forced the southern railroads to take part in the conspiracy. The rates were approved by the ICC. However, the defendants acted through rate bureaus that were not approved by the ICC; at the time the law did not provide for ICC approval of rate bureaus. Georgia alleged that the setting of rates through rate bureaus violated the antitrust laws. The complaint asked for damages and an injunction to end the conspiracy. 324 U.S. at 443–44, 455, 65 S.Ct. at 719–20, 725.

The Court held that *Keogh* barred the claim for damages because the rates were approved by the ICC. 324 U.S. at 453, 65 S.Ct. at 724. But because *Keogh* only addresses damage claims, the Court allowed the injunctive claim to proceed. *Id.* In this regard the Court made a statement that the plaintiffs in the present case rely on to argue that there is no immunity for a anticompetitive conspiracy:

> [W]e find no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of

rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier.

*Id.* at 458, 65 S.Ct. at 726.

The legislative history that led the district court to conclude that Reed-Bulwinkle left *Georgia* intact included several statements to that effect by the law's sponsors. For example, after the law passed Representative Bulwinkle said:

> The charge made against the railroads in the Georgia case is that they combined and conspired to fix rates by coercion and to discriminate against Georgia. A combination or conspiracy of that kind would not be protected or immunized [under the new law].

600 F.Supp. at 871 (quoting 94 Cong.Rec. App. 4033–34 (1948)). The district court also cited the final House and Senate Reports:

> The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, *except as to such agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body* upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted.

600 F.Supp. at 871 (quoting H.R.Rep. No. 1100, 80th Cong., 2d Sess., reprinted in 1948 U.S.Code Cong. & Admin.News 1844, 1848 (1948)) (emphasis added).

We do not read the statement from the House and Senate Reports that "The bill leaves the antitrust laws to apply with full force and effect" as preserving the *Georgia* rule that injunctive relief is available against anticompetitive conspiracies. This statement was qualified, as emphasized above, by a statement that the antitrust laws will not apply to agreements that have been approved by the ICC. Thus, if

the *Georgia* case had arisen after the enactment of Reed-Bulwinkle, and if the rate agreement had been approved by the ICC, the Supreme Court would have dismissed the injunctive claim.

Our view of the legislative history finds support in two Supreme Court cases. In *Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed. 2d 325 (1963), the Court stated that the result in *Georgia* "might today be different as a result of the Act of June 17, 1948, 62 Stat. 472, which gives the Interstate Commerce Commission authority to approve combinations of the character involved in that case and give them immunity from the antitrust laws." *Id.* at 306 n. 11, 83 S.Ct. at 482 n. 11. Similarly, in *Square D* the Court stated:

> The legislative history of Reed-Bulwinkle explains that it was enacted, at least in part, in response to this Court's decision in *Georgia*.... In that case, after restating the holding in *Keogh*, the Court held that, although Georgia could not maintain a suit under the antitrust laws to obtain damages, it could obtain injunctive relief against the collective ratemaking procedures employed by the railroads. The Reed-Bulwinkle Act thus created an absolute immunity from the antitrust laws for approved collective ratemaking activities.

106 S.Ct. at 1927–28 (footnotes omitted).

In light of plaintiffs' waiver of claims that defendants failed to comply with the rate agreement, there is no need to remand the compliance issue to the district court. Indeed, if such claims were to go forward, the question would arise whether they should be referred to the ICC. Such a referral is what plaintiffs wanted to avoid by waiving claims of noncompliance with the rate agreement. In sum, the effect of Reed-Bulwinkle together with the waiver is that all rate-related claims should be dismissed.[15]

---

**15.** In *United States v. Bessemer and Lake Erie R. Co.*, 717 F.2d 593 (D.C.Cir.1983), the D.C. Circuit upheld the criminal conviction of appellant railroad for Sherman antitrust violations arising out of a 1956 agreement to eliminate or inhibit

competition from private docks in handling iron ore on Lake Erie. Speaking of intent, the court observed:

> The activities described in the indictment do not fit within the narrow [§ 10706] privi-

## V. ANTITRUST STANDING

Defendants argue that Pinney does not have standing to bring claims concerning the assessment of handling charges on self-unloaders, the refusal to let self-unloaders operate at docks owned by the railroads, and the refusal to sell or lease dock space to Litton. Defendants also argue that Litton lacks standing to recover for the refusal to grant Pinney a competitive rail rate, the assessment of handling charges on self-unloaders, and the monopolization of land transportation.

In the district court, defendants challenged Pinney's standing on certain claims, including apparently the ones on which defendants argue lack of standing now. But defendants did not challenge Litton's standing below. Plaintiffs argue that because of this the court should not address the arguments about Litton's standing.

 "It is the general rule ... that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).[16] This rule is not jurisdictional; the Supreme Court has referred to it as a "practice" and a "rule of

procedure." *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Deviations are permitted in "exceptional cases or particular circumstances," *id.*, or when the rule would produce "a plain miscarriage of justice." *Id.* at 558, 61 S.Ct. at 722. The Supreme Court has declined to list comprehensively the circumstances that should prompt an appellate court to reach an issue not raised below. *See Singleton v. Wulff,* 428 U.S. at 121, 96 S.Ct. at 2877. Furthermore, the Court has stated that this matter is "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* We have carefully considered the case law of our circuit and elsewhere involving the exercise of this limited area of discretion and conclude that to the extent the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of this already protracted litigation, we should address it. *Alexander v. Aero Lodge No. 735,* 565 F.2d 1364, 1370–71 (6th Cir.1977). We realize that the importance of our discussion of this issue has been largely subsumed by our rulings on the *Keogh* and Reed-Bulwinkle issues.

---

lege. First, the indictment does not attack the rate bureau itself. It alleges, instead, that some members of the rate bureau entered into a separate agreement. This agreement only *incidentally touched upon the setting of rates;* its real purpose was to ward off the outside competition heralded by the advent of the self-unloaders.

More than mere purpose or "intent" distinguished this separate conspiracy from the rate bureau. Several of the actions taken by this separate conspiracy were not "in conformity with" the rate bureau's [10706] rate agreement.

Some of the actions were procedurally inconsistent with section [10706]. Paragraph 23(d) of the indictment alleges that defendants "quot[ed] the same charges for handling iron ore from self-unloaders as from bulkers even though services identified in the applicable tariffs were not to be performed." The crux of this charge is that handling the self-unloaders represented a significantly different type of service. Rather than promulgating a new rate for this new service in accordance with ICC requirements, the conspirators shielded the new joint rate from ICC scrutiny. *Id.* at 600–01 (citations and footnotes omitted). The D.C. Circuit also correctly confined itself to the special role of the United States in enforcing

the criminal aspects of the Sherman Act, noting that:

> The offense charged in this case is not subject to ICC remedial jurisdiction. The government does not seek to amend the [10706] rate agreement or to alter prospectively the rates set by the [10706] rate bureau; it seeks to punish an illegal antitrust combination which happened to employ a rate bureau. The ICC is not equipped to "remedy" criminal violations of the antitrust laws.

*Id.* at 600. The court rejected the concept of an immunity argument under Bulwinkle as untimely and declined to address a primary jurisdiction argument. *Id.* at 599–600. We do not find our holdings here necessarily at odds with those in *U.S. v. Bessemer* involving entirely different considerations of the role of the United States in the criminal enforcement of the Sherman Act.

16. This rule applies to a party seeking reversal. *Cf. Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970) ("The prevailing party may ... assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.")

## A. General Principles of Antitrust Standing

In *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereinafter *AGC*), the Supreme Court took a fresh look at antitrust standing. *See Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.1983) (*AGC* was "an obvious attempt to implement uniformity among the circuits"). *AGC* did not repudiate the Supreme Court's previous antitrust standing cases, but rather tried to synthesize them.

Our court has summarized the *AGC* factors:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and whether that harm was intended to be caused;

(2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;

(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

(4) the potential for duplicative recovery or complex apportionment of damages; and

(5) the existence of more direct victims of the alleged antitrust violation.

*Province v. Cleveland Press Publishing Co.,* 787 F.2d 1047, 1050–51 (6th Cir.1986) (quoting *Southaven Land Co.,* 715 F.2d at 1085). *Southaven* said this list of factors is not exhaustive. *See Southaven Land Co.,* 715 F.2d at 1085 n. 6. This reading of *AGC* seems correct. *See* 459 U.S. at 538, 103 S.Ct. at 908.

*AGC*'s attempt to synthesize precedents reflected the Court's view that the antitrust standing doctrine is rooted in the common law. The Court argued that when Congress enacted the first antitrust laws in 1890, it assumed they "would be subject to constraints comparable to well-accepted common-law rules." *Id.* at 533, 103 S.Ct. at 906. These include "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract."

*Id.* at 532–33, 103 S.Ct. at 905–06. Like commonlaw adjudication, antitrust standing analysis must be done case-by-case:

There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of "proximate cause," and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages. It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing. In both situations the infinite variety of claims that may arise make [sic] it virtually impossible to announce a black-letter rule that will dictate the result in every case.

*Id.* at 535–36, 103 S.Ct. at 907–08. Therefore, while the *AGC* checklist is the starting point of antitrust standing analysis, a consideration of earlier cases is relevant to the interpretation of the *AGC* factors.

## B. Defendants' Standing Arguments

*(1) The refusal to grant Pinney a commodity line-haul rate and the imposition of handling charges on self-unloaders*

■ The steel companies, who in the course of shipping iron ore paid the rail and handling charges, were the immediate victims of the defendants' refusal to grant Pinney a commodity line-haul rate and imposition of handling charges on self-unloaders at defendants' docks. Defendants argue that plaintiffs' damages from the handling charges are too indirect. The same argument can be made about Litton's damages from the rail rate. We must apply the five *AGC* factors to determine whether defendants' contention has merit.

The first *AGC* factor focuses both on the directness of the injury and the intention of the defendant. The leading case on directness of injury is *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed. 2d 707 (1977), where the Supreme Court held that an indirect purchaser cannot sue a manufacturer for overcharges imposed on a middleman and passed on to the indirect purchaser.

In *Illinois Brick* the State of Illinois alleged that the defendant, a manufacturer of concrete block, engaged in a price-fixing conspiracy in violation of the antitrust laws. The defendant sold block to masonry contractors, who used the block in masonry structures that they sold to general contractors. The general contractors incorporated the masonry structures into larger structures that the state bought. The state sued the manufacturer for the amount of the overcharge that passed from the masonry contractors through the general contractors and then on to the state.

The Court held that the state did not have standing to sue the manufacturer for antitrust damages. The primary reason for this holding was that allowing indirect purchasers to sue "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers." 431 U.S. at 737, 97 S.Ct. at 2070. *See id.* at 741–45, 97 S.Ct. at 2072–74. Apportioning damages along the chain of distribution would "weigh[ ] down treble-damages actions with ... 'massive evidence and complicated theories.'" *Id.* at 741, 97 S.Ct. at 2072 (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)).

The Court also refused to make an exception for businesses in which the direct purchaser typically passes on the entire cost of a certain component, for example an item that is resold without alteration. The Court reasoned that proving that this is the practice would also entail "massive evidence and complicated theories." *Illinois Brick*, 431 U.S. at 745, 97 S.Ct. at 2074 (quoting *Hanover Shoe*).

The other reason for the Court's allowing only direct purchasers to recover was that such a rule would best serve antitrust enforcement. *Id.* at 745–47, 97 S.Ct. at 2074–75. Because the injury to direct purchasers is usually greater than the injury to indirect purchasers, direct purchasers have a greater stake in the outcome of litigation and are more likely to sue. *Id.* at 747, 97 S.Ct. at 2075. Direct purchasers will have even more incentive to sue if they are allowed to recover the full amount of the overcharge. Thus, the Court "elevat[ed] direct purchasers to a preferred position as private attorneys general...." *Id.* at 746, 97 S.Ct. at 2075.

While directness of injury favors the defendants, the other consideration in the first *AGC* factor, intent, tends to favor the plaintiffs. They allege that the object of defendants' ratemaking decisions has been to drive plaintiffs out of business. The Court stated that "there no doubt are cases in which such an allegation [of defendants' intent] would adequately support a plaintiff's claim." *AGC*, 459 U.S. at 537 n. 35, 103 S.Ct. at 908 n. 35. The Court also cited an article for the proposition that the "specific intent of [a] defendant to cause injury to a particular class of persons should 'ordinarily be dispositive' in creating standing to sue." *Id.* (citing Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits*, 71 Colum.L.Rev. 1, 30 (1971)). The Court further cited an article that "suggest[ed] that standing in a group boycott situation should be based on the purpose of the boycott." 459 U.S. at 537 n. 35, 103 S.Ct. at 908 n. 35 (citing Lytle & Purdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation*, 25 Am.U.L. Rev. 795, 814–16 (1976)). However, the Court stated that "an allegation of improper motive ... is not a panacea that will enable any complaint to withstand a motion to dismiss." *AGC*, 459 U.S. at 537, 103 S.Ct. at 908. Thus, intent must be balanced with the rest of the *AGC* factors.

The second *AGC* factor relates to the status of the plaintiff as consumer or competitor. As Pinney competes with defendants in the provision of dock services, and Litton also tried to enter that business, this factor also favors the plaintiffs.

The third *AGC* factor, the degree to which the damages involved are speculative, favors the defendants. To assess the effects of a hypothetical change in line-haul

rates or handling charges, the district court would need to undertake the difficult and uncertain task of ascertaining demand elasticities, the input of the challenged charge and other costs in the prices charged by the plaintiff and its competitors, and the role of non-profit considerations in pricing decisions. *See Illinois Brick*, 431 U.S. at 742–43, 97 S.Ct. at 2072–73. Further, for Pinney and Litton to prove the extent of their losses from the unavailability of the commodity rail rate and from the imposition of handling charges, they would have to produce evidence on the following questions: What non-price factors (such as relationships with railroads, docks, and water transport companies) influenced the steel mills' purchase of transport for iron ore? Assuming plaintiffs can prove how much more demand there would have been for shipment by self-unloader, how much of the increase could Pinney and Litton have absorbed? Assuming that Pinney and Litton could have absorbed all the extra demand for shipping iron ore by self-unloader, would competitors have taken business away from them? If there were no competitors during the time in question, would new competitors have appeared to take advantage of the increased opportunities? Under *Illinois Brick* and *AGC* courts cannot be saddled with the time-consuming and speculative task of sifting through massive evidence to decide such questions.

*AGC*'s fourth factor, the potential for complex apportionment of damages between plaintiffs, also favors defendants. Pinney and Litton could themselves become adversaries: Pinney could argue that lower water transport charges would have caused increased demand for dock services, which would have led to higher charges for dock services; Litton could argue that cheaper dock services would have caused greater demand for shipment by self-unloaders, which in turn would have led to higher prices for Litton's services.

*AGC*'s fifth and final factor is the existence of more direct victims. Plaintiffs argue that the direct purchasers here, the

steel mills, cannot sue because of *Keogh*. Thus, if Pinney and Litton cannot sue there will be no "private attorney general" to enforce the antitrust laws in this case.[17] While the steel mills cannot sue for antitrust damages, the mills do, however, have a role that takes antitrust policy into account. As *Keogh* mentions, the shippers can challenge rates under the ICA. In adjudicating such a challenge, one factor that the ICC will consider is whether the benefits to transportation policy of uniform rates, which are anticompetitive by nature, outweigh the procompetitive policies of the antitrust laws. Thus, it appears that this factor favors the defendants.

On balance, the *AGC* factors clearly favor the defendants. It is true that plaintiffs are defendants' competitors and that these claims involve allegations of intentional harm. However, it is more significant that plaintiffs are not the direct victims of the defendants' acts. Further, it would be an extremely complex, if not impossible task for the district court to cope with the problems of computation and apportionment of damages. Given these factors, we conclude that we must dismiss the handling charge claim as to both defendants and the rate claim as to Litton.

*(2) The refusal to handle self-unloaders at railroad docks or to sell or lease docks to Litton*

Defendants argue that Pinney cannot claim damages for the refusal to handle self-unloaders at railroad docks, because this would have sent the self-unloaders to Pinney. This argument finds support in a recent decision, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), where the Supreme Court stated that a conspiracy to charge higher than competitive prices is an antitrust violation but "actually *benefit[s]*" the conspirators' competitors. *Id.* at 583, 106 S.Ct. at 1354 (emphasis in original).

As for the refusal to sell or lease docks to Litton, defendants apparently over-

---

**17.** It does appear, however, that the same area of activity challenged here has been made the subject of scrutiny by the Justice Department. *See* note 15, *supra.*

looked the fact that this claim is not in Pinney's complaint.

### (3) The monopolization of land transportation of iron ore

The district court dismissed Pinney's claim based on the monopolization of land transport, and defendants argue that Litton's claim is even more remote than Pinney's. Plaintiffs do not contest this argument.

Thus, for the reasons enumerated above, we reverse the holding of the district court and find plaintiffs Pinney and Litton lack standing to assert the claims addressed above.

## VI. FEDERAL STATUTE OF LIMITATIONS

### A. Fraudulent Concealment

In the district court, the defendants moved to dismiss the plaintiffs' claims insofar as they were based upon events or activities which occurred before the four-year limitations period of section 4B of the Clayton Act, 15 U.S.C. § 15b. Treating these motions as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the district court found that there was a genuine issue of material fact whether the defendants had fraudulently concealed plaintiffs' causes of action which may have accrued before the four-year limitations period. The district court therefore denied the motions. *Pinney Dock & Transport Co. v. Penn Central Corp.*, 1983–2 Trade Cas. (CCH) ¶ 65,608 (N.D. Ohio 1983).

Under the doctrine of fraudulent concealment, if a defendant conceals from the plaintiff the existence of a cause of action, the statute of limitations is tolled. To toll the statute, the plaintiff must allege in the complaint that: (1) the defendant concealed the conduct that constitutes the cause of action; (2) defendant's concealment prevented plaintiff from discovering the cause of action within the limitations period; and (3) until discovery plaintiff ex-

ercised due diligence in trying to find out about the cause of action. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975). The burden of proving the elements of fraudulent concealment is upon plaintiff. *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233, 234 n. 5 (6th Cir.1974); *In re Beef Industry Anti-Trust Litigation*, 600 F.2d 1148, 1171 (5th Cir.1979). *But see Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984), holding that the burden of showing lack of due diligence shifts to defendant.

In denying the defendants' motions for summary judgment the district court ruled that a genuine issue of material fact existed as to each element of *Dayco*. Defendants attack this ruling and also argue that the district court applied the wrong theory to the first *Dayco* element.

The equitable doctrine of fraudulent concealment represents a longstanding exception to the rule that the plaintiff must commence his action within the period provided by the relevant statute of limitations. "[T]he authorities are without conflict in support of the doctrine that where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other, the statute will not bar relief provided suit is brought within proper time after the discovery of the fraud." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 347–48, 22 L.Ed. 636 (1874). However, because "statutes of limitation are vital to the welfare of society and are favored in the law," the plaintiff who invokes the doctrine of fraudulent concealment will be "held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.'" *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 139–40, 25 L.Ed. 807 (1879) (citation omitted).[18]

---

**18.** This rule of "particularity" has been codified in Rule 9(b) of the Federal Rules of Civil Procedure, which states in part: "In all averments of

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particulari-

In the context of private anti-trust actions the doctrine of fraudulent concealment is well recognized by the federal courts, including our own court. *See Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230 (6th Cir.1974); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975). *See also* Annotation, *Application of Fraudulent Concealment Doctrine to Statute of Limitations in Antitrust Cases* (15 U.S.C.S. § 15b), 72 A.L.R. Fed. 431. As we held in *Dayco:* "We have recognized that the statute of limitations applicable to private anti-trust actions may be tolled where a plaintiff did not file its action in time because of ignorance resulting from a defendant's fraudulent concealment." 523 F.2d at 394.

### B. The element of wrongful concealment.

█ On appeal, the defendants initially contend that the district court below erred in holding that *Dayco*'s first element, "wrongful concealment," does not require proof of affirmative acts of concealment. The district court, however, held:

> It does not make sense to rigidly apply a statute of limitations where the defendant has carried out its illegal activities in "a manner which precluded detection." As the Supreme Court stated in *Bailey v. Glover*, 88 U.S. [21 Wall.] 342 [22 L.Ed. 636] (1874):
>
>> [Statutes of Limitation] were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which should show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, *or by committing a fraud in a manner that it concealed itself* until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure. [Emphasis added.]

*Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,041 n. 6. According to the defendants, the district court's reliance upon *Bailey v. Glover* for the proposition that "wrongful concealment" may also be established by conduct which causes a conspiracy to be carried out "in a manner which precludes detection" or "self-concealing misconduct" is misplaced. We agree with defendants at least to the extent that the Sixth Circuit has apparently not conclusively decided the issue of whether the element of wrongful concealment requires proof of affirmative acts.

In *Campbell v. Upjohn Co.,* 676 F.2d 1122 (6th Cir.1982), the Sixth Circuit, although not actually confronted with the issue of whether fraudulent concealment required proof of affirmative acts, did recognize that there was a distinction between non-active and active concealment. Plaintiff alleged that a corporation fraudulently induced him to sign a merger agreement and then took additional steps to fraudulently conceal from him the terms of that agreement. The district court held that because the plaintiff failed to satisfy the requirement of due diligence in discovering his cause of action, he was barred by the statute of limitations. On appeal, the plaintiff argued that the due diligence requirement should not apply to cases of "active" fraudulent concealment where the defendant has engaged in affirmative acts of concealment beyond the original fraud itself. Our court rejected this argument, holding "that alleged additional acts of concealment by the defendant beyond the original fraud did not exempt the plaintiff from the requirement of diligence in pleading the federal equitable tolling doctrine of fraudulent concealment." *Id.* at 1128. The court did state, however, that "[a]ctive concealment by the defendant will be considered in determining the reasonableness of the behavior of the plaintiff under the circumstances" in discovering his cause of action. *Id.* In reaching this conclusion, the court emphasized that:

> [Plaintiff] would have the statute tolled indefinitely, while evidence stales, memo-

ty." In the instant case, there is no dispute that

plaintiffs failed to comply with this rule.

ries fade and courts and adversaries wait, until the plaintiff at his leisure alleges actual discovery, despite the avalanche of evidence that would put all but the most indiligent plaintiffs on notice of a cause of action.

> Statutes of limitations are vital to the welfare of society and are favored in the law. Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain. *Dayco Corp. v. Goodyear Tire & Rubber Co., supra,* 523 F.2d 389 at 394 (citations omitted).

A plaintiff who requests the avoidance of these important objectives owes the courts, the public and his adversaries a duty of diligence in discovering and filing his lawsuit.

*Id.* In holding that affirmative acts of concealment by the defendant beyond the original fraud do not relieve the plaintiff of the requirement of due diligence, the court therefore joined "those circuits which have declined to formulate a separate rule for cases involving active concealment by the defendant." *Id.*

The Supreme Court has apparently had only two occasions to discuss the doctrine of fraudulent concealment at any length, and both of these cases are quite old. In *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874), which the district court placed heavy reliance upon in the instant case, the Supreme Court held upon the facts then before it that plaintiff's action was not barred by the statute of limitations because, "[t]o hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." *Id.* at 349.

In *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 25 L.Ed. 807 (1879), however, the Supreme Court held:

> Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.
>
> There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself.
>
> The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence.

*Id.* at 143.

Thus, while *Bailey v. Glover* indicates that the commission of a fraud which "is of such a character as to conceal itself," may be sufficient to toll the statute of limitations under the fraudulent concealment doctrine, *Wood v. Carpenter* holds that "concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry."

*Bailey v. Glover* was subsequently followed by the Supreme Court in *Exploration Co. v. United States,* 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918). The government argued that the principles of *Bailey v. Glover* were applicable to the instant action, and argued further that "[t]here were affirmative acts of concealment; but it is enough that the fraud was such as to conceal itself." *Id.* at 445, 38 S.Ct. at 572.

The Supreme Court affirmed the court of appeals, holding:

> When Congress passed the Act in question the rule of *Bailey v. Glover* was the established doctrine of this court. It was presumably enacted with the ruling of that case in mind. We cannot believe that Congress intended to give immunity to those who for the period named in the statute might be able to conceal their fraudulent action from the knowledge of the agents of the government. We are aware of no good reason why the rule, now almost universal, that statutes of limitations upon suits to set aside fraudulent transactions shall not begin to run until the discovery of the fraud, should not apply in favor of the government as well as a private individual.

*Id.* at 449, 38 S.Ct. at 574. *See also United States v. Diamond Coal Co.,* 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660 (1921).

*Bailey v. Glover* was likewise followed in *Rosenthal v. Walker,* 111 U.S. 185, 4 S.Ct. 382, 28 L.Ed. 395 (1884), which also distinguished *Wood v. Carpenter.* In *Walker,* plaintiff alleged that the bankrupt transferred certain property to the defendant in order to prevent the plaintiff from claiming an interest in that property in bankruptcy proceedings. Although the action was brought after the applicable statute of limitations had expired, plaintiff alleged that the bankrupt and the defendant kept concealed from him the fact of the sale, transfer, and conveyance of the goods.

On appeal to the Supreme Court, the defendant argued that plaintiff's action was barred by the statute of limitations. The Supreme Court rejected this argument stating:

> The case of *Bailey v. Glover* is a decision construing the statute which is relied on in this case, and unless subsequently overruled by this court is conclusive of the point under discussion. It has never been overruled. The plaintiff in error relies on the case of *Wood v. Carpenter,* 101 U.S. 135, and *National Bank v. Carpenter, Id.* [101 U.S. (11 Otto)] 567 [25 L.Ed. 815 (1879)]. The first was an action at law, the second a suit in equity. The court in both cases was called on to construe a statute of limitations of the State of Indiana, and it followed the adjudication of the Supreme Court of that State upon the same statute. Neither case refers to the opinion of the court in *Bailey v. Glover,* or can be held to overrule or modify it. The case of *Bailey v. Glover* has been often cited by this court, but has never been doubted or qualified. *Wood v. Bailey,* 21 Wall. [88 U.S.] 640 [22 L.Ed. 689]; *Wiswall v. Campbell,* 93 U.S. [3 Otto] 347 [23 L.Ed. 923]; *Gifford v. Helms,* 98 U.S. [8 Otto] 248 [25 L.Ed. 57]; *Upton v. McLaughlin,* 105 U.S. [15 Otto] 640 [26 L.Ed. 1197]. We are of opinion, therefore, that the assignment of error under consideration is not well founded.

*Walker,* 111 U.S. at 190–91, 4 S.Ct. at 384–85. Thus, according to *Rosenthal v. Walker, Wood v. Carpenter* is limited to the particular case in which the Court was construing a state statute of limitations and following the adjudications of the Supreme Court of Indiana. *See also Traer v. Clews,* 115 U.S. 528, 538, 6 S.Ct. 155, 159, 29 L.Ed. 467 (1885) ("The case of *Bailey v. Glover,* has never been overruled, doubted, or modified by this court. On the contrary, in *Rosenthal v. Walker,* it was reaffirmed, and was distinguished from the case of *Wood v. Carpenter* ..."). See, however, *Felix v. Patrick,* 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892), which neither cites to, nor makes any attempt to reconcile, *Bailey v. Glover* with *Wood v. Carpenter.*

The last reference made to *Wood v. Carpenter* by the Supreme Court occurred in *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979), where the Supreme Court cited that case for the proposition that, "[s]tatutes of limitations, ... 'are found and approved in all systems of enlightened jurisprudence,' *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 139, 25 L.Ed. 807 (1879)...." Apart from one oblique reference in *Kubrick,* however, the Supreme Court has not recently had occasion to cite or otherwise discuss either *Wood v. Carpenter* or *Bailey v. Glover.* One distinguished commentator has explained the difference between active and passive fraudulent concealment as follows:

> "Where undiscovered "fraud" was the basis of liability, it was universally agreed that no new concealment was necessary and the wrongdoer might remain wholly passive, provided no avenues were open to the plaintiff for discovery of the fraud. But in cases that fell outside the elastic boundaries of the "fraud" exception new difficulties appeared. To permit suspension of the statute of limitations in all cases where the suitor was ignorant of his claim must have seemed hazardous. Behind the decisions there must have lain a conviction that for suspension of the statute outside the field of "fraud" there should be added to the suitor's ignorance some affirmative misconduct by the opposite party, prevent-

ing discovery and excusing delay. And when the "fraudulent concealment" exception had once been formulated, the language of the formula itself gave a new direction to judicial inquiries. In examining the factual cases for suspension of the statute they were led beyond a scrutiny of the original cause of action and of the *plaintiff's* later opportunities for *discovery*, to an emphasis on the means by which the *defendant obstructed* discovery.

There can be found in the cases innumerable statements that "fraudulent concealment" involves affirmative efforts by the defendant to prevent discovery. But qualifications are often attached. It is said that the defendant's concealment need not be subsequent to the original wrongdoing, but may proceed or accompany it, provided all his conduct taken together is calculated to mislead or allay suspicion. It is sometimes added that all requirements are satisfied if the original misconduct was of such a kind as to "conceal itself." And finally, in some cases the further requirement is added that defendant's efforts must include some element of "fraud" or moral turpitude, though numerous decisions reject such a test. From such a welter of conflicting generalities one can only draw the conclusion that generalities are being overworked, that in each case too wide a variety of fact situations is being included in a single formula."

Dawson, *Fraudulent Concealment and Statutes of Limitation*, 31 Mich.L.Rev. 875, 880–82 (1933) (footnotes omitted).

Most of the appellate cases which have addressed the issue in the context of antitrust actions have required allegations or proof of affirmative concealment under the first element of the doctrine of fraudulent concealment. *See, e.g., Hennegan v. Pacifico Creative Service Inc.,* 787 F.2d 1299 (9th Cir.1986); *Berkson v. Del Monte Corp.* 743 F.2d 53 (1st Cir.1984); *Rutledge v. Boston Woven Hose and Rubber Co.,* 576 F.2d 248 (9th Cir.1978); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 461 (2d Cir.1974); *Laundry Equipment Sales*

*Corp. v. Borg–Warner Corp.,* 334 F.2d 788, 792 (7th Cir.1964).

The defendants rely on these and other cases to argue that "proof of affirmative acts of concealment such as those involved in the cases cited … is essential to protect the important policies underlying the statute of limitations." As defendants point out:

> In *Dayco*, after noting that the statute of limitations in private antitrust cases may be tolled by fraudulent concealment, this court cautioned nonetheless that, "as the Supreme Court observed in *Wood v. Carpenter*, 101 U.S. [at 139]: 'Statutes of limitations are vital to the welfare of society and are favored in the law.' Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain." 523 F.2d at 394. The policies of protecting defendants and courts from stale claims counsel against a broad interpretation of tolling doctrines, and the reasons for that approach "are particularly persuasive when viewed against the strong congressional policy in favor of repose in antitrust suits." (citations omitted).

Although the district court below acknowledged the Ninth Circuit's opinion in *Rutledge, Pinney Dock & Transport v. Penn Central Corp.,* 1983–2 Trade Cas. ¶ 65,608 at 69,040, the court nevertheless concluded that the first *Dayco* element did not necessarily require proof of affirmative acts of concealment. According to the district court:

> Thus, under *Dayco*'s first element, the type of actions of defendants which might wrongfully conceal a conspiracy to violate the antitrust laws can embrace, but are not limited to, fraudulent misrepresentations as articulated in the *Rutledge* reference, *supra*. The actions of defendants can also be those which cause a conspiracy to be carried out in "a manner which precludes detection," *e.g.,* "self-concealing misconduct." *See Gaetzi v. Carling Brewing company,* 205 F.Supp. 615, 620–621 (E.D.Mich.1962). *Cf. King & King Enterprises v. Champ-*

*lin Petroleum Co.,* 657 F.2d 1147, 1154 (10th Cir.1981), *cert. denied,* 454 U.S. 1164 [102 S.Ct. 1038, 71 L.Ed.2d 320] (1982). Hence, the Court finds impermissible the implication of the defendants that "[i]n order to make out the first element of fraudulent concealment Pinney must show affirmative acts of concealment by the defendants" which constitute fraudulent misrepresentations.

*Id.* at 69,041.

While Judge Thomas appropriately cites *Gaetzi,* Judge McCree's analysis in that opinion leads us to a different result. In *Gaetzi,* a former distributor of Carling Beer brought an antitrust action in 1961 seeking damages for defendant's allegedly wrongful termination of his Carling distributorship. Defendant then filed a motion for summary judgment on the ground that the cause of action was barred by the four year statute of limitations applicable to private antitrust actions. Plaintiff in turn argued that the period of limitations was suspended by reason of the defendant's fraudulent concealment.

In addressing this issue, then District Judge Wade H. McCree, Jr., initially noted that, "[t]he contours of this doctrine in relation to private antitrust actions unfortunately are by no means as precise as either of the parties insists." 205 F.Supp. at 619–20. In this regard, plaintiff argued that fraudulent concealment did not require proof of affirmative acts, while the defendant argued that the doctrine did require such proof. Judge McCree initially observed:

> It does appear to be settled that where the gravamen of an action is fraud and "the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Bailey v. Glover, supra,* 88 U.S. at 348.

\* \* \* \* \* \*

The cause of action asserted in the present case, however, is predicated neither on fraud nor on breach of a fiduciary duty, but on violation of the antitrust laws. The first question to be considered then is whether plaintiff is correct in his assertion that in an antitrust action ignorance of the facts constituting the cause of action suspends the prescriptive period, absent affirmative acts of concealment by defendant.

*Gaetzi,* 205 F.Supp. at 620. After examining the cases cited by plaintiff, Judge McCree noted that "each of the cases upon which plaintiff relies involved something more than mere silence on the part of the defendant." *Id.* He further noted:

> The illegal conspiracies proceeded in a manner which precluded detention [sic]. The activities of the defendants can be characterized as 'self-concealing.' The fact that the defendant did not take further steps to impede discovery after the plaintiff had sustained injury is unimportant, for the conduct which is denominated 'concealment' may take place before the cause of action accrues as well as afterwards.

*Id.*

Next, Judge McCree examined the cases cited by defendant for the proposition that an affirmative act of concealment is required in order to toll the statute of limitations. After examining these cases, Judge McCree concluded:

> Although the cases cited by plaintiff have sometimes been regarded as supporting the argument that no affirmative act of concealment is required to toll the statute in restraint of trade conspiracy cases, on analysis they all involve self-concealing misconduct and are not incompatible with the rationale underlying the principle that affirmative acts of concealment must be shown except in cases founded on fraud or breach of fiduciary duty.

*Id.* at 621.

Applying the foregoing principles to the facts of *Gaetzi,* Judge McCree concluded that no genuine question of fact existed with respect to circumstances which would

toll the four year statute of limitations. At least two of Judge McCree's factual conclusions are instructive:

2. *Failure to respond to plaintiff's inquiries.* Plaintiff states that his repeated efforts to obtain from defendant an explanation as to the reason for his loss of the Carling distributorship were unsuccessful. He does not claim that defendant, by a false but plausible explanation, dissuaded him from seeking out the facts. All that defendant did was to remain silent. Clearly the silence of defendant could not have been calculated to deter plaintiff from other inquiry, but could only have compounded plaintiff's suspicions. With reason to suspect that the loss of his business was the result of illegal conduct by defendant, plaintiff was obliged to do more by way of investigation then simply to make fruitless inquiries of the suspected wrongdoer. We have previously indicated that concealment necessitates the commission of affirmative acts. Mere silence, where there is no duty to speak, does not toll the statute.

*Id.* at 622. Judge McCree also concluded:

4. *Self-concealment of the alleged conspiracy.* "Self-concealment" of a conspiracy sufficient to toll the statute of limitations refers to activities in furtherance of the conspiracy which by their nature defy detection. Plaintiff asserts that defendant concealed its unlawful activities by operating through its parent corporation. However, unlike the *American Tobacco* [*Co. v. Peoples Tobacco Co.*, 204 F. 58 (5th Cir.1913)] case, *supra*, the relationship existing between the two companies was well known or readily ascertainable. As the uncontroverted affidavit of the executive vice-president of Canadian Breweries Ltd. indicates, the parent-subsidiary relationship between Canadian Breweries and defendant has been a matter of record in Canadian's annual report to shareholders since 1945. Furthermore, there is quoted in defendant's brief an excerpt from the plaintiff's deposition in the United States District Court suit in Pennsylvania, in which plaintiff admitted that he had been informed in 1952 that the controlling interest in defendant had been purchased by someone in Canada.

. . . .

The report condemned the acquisition by Canadian Breweries as a monopolistic activity. Since this official document was printed and available to the public according to plaintiff's own allegation, even before plaintiff's distributorship had been terminated, it would appear that the alleged conspiracy was no longer concealed and could have been discovered by due diligence well within the statutory period for bringing suit.

*Id.* at 623. Based in part on the foregoing, Judge McCree therefore granted the defendant's motion for summary judgment dismissing the plaintiff's complaint as being time-barred by the Clayton Act's four year statute of limitations period. Apparently, this case was not appealed to the Sixth Circuit.[19]

Thus, according to *Gaetzi*, although self-concealing misconduct may be sufficient for purposes of the first element of fraudulent concealment, the cases involving such conduct "are not incompatible with the rationale underlying the principle that affirmative acts of concealment must be shown except in cases founded on fraud or breach of fiduciary duty." *Gaetzi*, 205 F.Supp. at 621. Moreover, Judge McCree emphasized that " 'self-concealment' of a conspiracy sufficient to toll the statute of limitations refers to activities in furtherance of the

---

**19.** The other case cited by the district judge here to support his conclusion is *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147 (10th Cir.1981), wherein the Tenth Circuit held "[b]oth of the tests which were set forth in *Ashland Oil Co. [v. Union Oil Co.*, 567 F.2d 984 (1977) ], were met here. The evidence showed that the defendant actively sought to conceal its price fixing activities, and the defendant's conduct, by reason of its fraudulent nature, was inherently self concealing." *Id.* at 1156. *See also Baker v. F. & F. Investment*, 420 F.2d 1191, 1199 (7th Cir.1970) ("[w]here, as in the case of many conspiracies in violation of federal antitrust laws, the wrong is self-concealing, little need be added in order to justify tolling the statute.").

conspiracy *which by their nature defy detection."* *Id.* at 623. Mere silence, or one's unwillingness to divulge one's allegedly wrongful activities, is not sufficient. As the underlying cause of action here is based upon alleged antitrust violations not fraud, we agree with Judge McCree's rationale in *Gaetzi* that a plaintiff should be required to prove affirmative acts of concealment, particularly in light of the strong policy in favor of statutes of limitations.

### 3. Scope of Review of Denial of Summary Judgment

■ When an appellate court reviews a grant of summary judgment, the district court decision is reviewed de novo. *See, e.g. National Bank of Detroit v. Shelden,* 730 F.2d 421, 423 (6th Cir.1984); *Glenway Industries, Inc. v. Wheelabrator–Frye Inc.,* 686 F.2d 415, 417 (6th Cir.1982).

However, in reviewing a district court's ruling denying a summary judgment motion on grounds that a material issue of fact exists appellate review is governed by an "abuse of discretion" standard. *See, e.g., United States v. Merchants National Bank of Mobile,* 772 F.2d 1522, 1524 (11th Cir.1985); *Marcus v. St. Paul Fire & Marine Ins. Co.,* 651 F.2d 379, 382 (5th Cir. 1981); *McLain v. Meier,* 612 F.2d 349, 356 (8th Cir.1979). The difference in the standards of review has been explained as follows:

> Discretion plays no real role in the grant of summary judgment: the grant of summary judgment must be proper under the above principles or the grant is subject to reversal. The trial court may, however, exercise a sound discretion in denying summary judgment where, although the movant may have technically shouldered his burden, the court is not reasonably certain there is no triable issue of fact; where a portion of an action may be ripe for summary judgment but is intertwined with another claim(s) that must be tried; and in certain other situations.

6 *Moore's Federal Practice* ¶ 56.15[8] (2d ed. 1985).

### 4. Review of Evidence on Whether there are Issues of Fact on Dayco Elements

#### a. Whether there is Sufficient Evidence of Affirmative Acts of Concealment in Pinney Dock

The defendants apparently do not dispute the district court's conclusion that their conduct was sufficient to satisfy the self-concealment standard. That is, if our court should conclude that a self-concealment standard is appropriate in this case, defendants apparently would concede that the district court's application of that standard to the facts of this case and his factfindings was not erroneous.

■ We have, however, concluded that defendants are correct in their argument that the doctrine of fraudulent concealment requires proof of affirmative acts under facts such as those presented here and in *Gaetzi.* The issue then becomes what kind of conduct is sufficient to satisfy that standard and whether that standard was satisfied here. According to the defendants "[t]he weight of judicial authority holds that in order to demonstrate affirmative concealment, a plaintiff must present evidence of destruction of records, falsification of accounts, or the use of other covert devices...." The defendants note that the district court in *Pinney* found evidence of two instances of acts of concealment: (1) that Penn Central had not been "open and honest with Pinney as to the reasons Pinney was denied a commodity rate," *Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,046; and (2) that Penn Central had "affirmatively misled Pinney into believing that it was willing to 'take care' of Pinney Dock's iron ore requests." *Id.* They contend that this evidence, when analyzed, does not constitute affirmative acts of concealment sufficient to meet *Dayco*'s requirements.

In *Ohio Valley Electric Corp. v. General Electric Co.,* 244 F.Supp. 914 (S.D.N.Y. 1965), a case involving an alleged antitrust conspiracy in the electric industry, Judge Feinberg held that the plaintiffs had presented:

abundant proof that defendants affirmatively and deliberately concealed the existence of the conspiracy. The conspirators concealed their activities from their customers, the government, and officers and employees of defendants who did not participate. To achieve and preserve secrecy, the conspirators falsified their expense accounts to hide the true nature and purpose of their meetings and trips, made telephone calls at night from pay telephones rather than from their offices, destroyed notes taken at conspiratorial meetings, and instructed newcomers to the conspiracy not to divulge its existence.

*Id,* at 931–32. Significantly, Judge Feinberg believed that his conclusion was consistent with both Judge McCree's analysis in *Gaetzi,* 205 F.Supp. 615 and with the policies underlying the doctrine of fraudulent concealment discussed by the Supreme Court in *Bailey v. Glover,* 88 U.S. 342.

In *Ingram Corp. v. J. Ray McDermott & Co.,* 1980–1 Trade Cas. (CCH) ¶ 63,277 (E.D.La.1980), *rev'd on other grounds,* 698 F.2d 1295 (5th Cir.1983), another case cited by the defendants, the district court discussed what kind of acts are and are not sufficient for purposes of affirmative concealment. According to the district court:

Subparagraph (a) speaks of "clandestine meetings in hotel rooms" at which the rigging of bids was discussed. This allegation amounts to very little, for there is no obligation on the part of antitrust conspirators to advertise their conduct. One cannot expect bid riggers to hold a public meeting for that purpose. However subparagraphs (b) and (c) are quite different. In each plaintiffs allege that the defendants performed certain acts in furtherance of the conspiracy which created the false impression that project bids were competitively made rather than rigged. This is something more than silence; if true, it constitutes an attempt to deceive both the competition and the public into the belief that all of their bids were made legitimately and as the result of competitive considerations. It is precisely the sort of affirma-

tive act of deception required by the jurisprudence.

*Id.* at 78,414. The affirmative acts referred to in subparagraphs (b) and (c) included submitting prearranged losing bids by the company that had agreed not to receive the award, in order to give the illusion of competition among the corporate defendants, and maintaining agreed-upon ratios of major equipment spreads and positioning equipment in particular localities throughout the world, so as to give the false impression that excessive bids on particular projects were the result of equipment availability rather than of the unlawful conspiracy.

In the instant case, Judge Thomas discussed several instances in which he believed the defendants' actions constituted affirmative acts of concealment, notwithstanding his general conclusion that the defendants' alleged antitrust conspiracy was self-concealing conduct for purposes of the fraudulent concealment exception to the statute of limitations. The first instance of affirmative acts discussed by Judge Thomas involved certain memoranda and letters written in late 1969 and early 1970. In this regard plaintiff submitted evidence of a series of meetings in 1968 and 1969 and argued that they were deliberately kept concealed. For example, a July 17, 1968, letter from J.K. Thorney, B & O director of coal commercial planning, to the general coal traffic managers-rates of Penn Central and N & W, stated, *inter alia:*

following our day long meeting held in New York on July 9, the matter of handling charges on ex-lake iron ore received from self-unloader vessels was very briefly discussed....

... Our records also indicate that there was a *verbal agreement* made by all lines to assess the same charges as bulk freights. [Emphasis added by district court.]

*Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,043.

As additional evidence of the defendants' secrecy, the district court notes that on August 25, 1969, Thorney again wrote to

C.S. Baxter, Chairman, Coal, Coke & Iron Ore Committee (CCIOC)—Eastern Railroads, and stated:

> I have just received information that some of the members of the Coal, Coke & Iron Ore Committee, are now in the process of reissuing their ex-lake iron ore tariffs, and there are indications that deviations may be made from the previous tariffs insofar as the manner of publication of such reissues. Under the circumstances, I believe this matter should be discussed by all members *at the conclusion of the next meeting, which is to be held on September 11.*
>
> *This subject, of course, should not be listed on the regular docket but handled informally after the regular meeting.* [Emphasis added by district court.]

*Id.* at 69,043–44.

In addition, the district court notes that on March 26, 1970, Thorney also sent a memo to G.A. Sandmann marked "Personal" detailing a discussion on March 24, 1970, about ex-lake iron ore handling charges. In that letter, Thorney stated:

> There was no committee record other than the subject had been reviewed.... The above for your personal information only, and not to be disclosed to anyone in any manner at this time.

*Id.* at 69,044.

Although defendants apparently did not controvert Pinney Dock's assertion that the above mentioned meetings and dealings were kept secret, they argued that they were not obligated to disclose their private business communications and proposals. Pinney Dock, in turn, argued that under the terms of the railroads' 5A Agreement, they had a duty to issue public notices of meetings, proposals, and rate decisions.[20]

In sum, Judge Thomas concluded that the memoranda and letters discussed above permit an inference that the defendants took steps to insure that their actions would not become public. According to Judge Thomas, "[t]hese affirmative acts may be found by the trier of fact to constitute both wrongful concealment of the alleged conspiracy in violation of the antitrust laws and acts in furtherance of the conspiracy." *Id.*

In their brief, the defendants apparently do not dispute these findings of "affirmative acts" by the district judge. Indeed, it would appear that these meetings and dealings, which were apparently done in secret and possibly not in compliance with the ICC requirements requiring open and public meetings, are analogous to the secret phone calls in *Ohio Valley Electric Corp.* On the other hand, such secret meetings may be more analogous to the "clandestine meetings in hotel rooms" which were not deemed sufficient for purposes of affirmative concealment in *Ingram Corp.*

Apart from this evidence, the district court also concluded that a genuine issue of fact existed as to whether a series of letters written in 1968 and 1969 by Penn Central in response to Pinney's request for a line-haul commodity rate demonstrated that the defendants concealed the antitrust conspiracy through affirmative misrepresentations to Pinney. Significantly, Judge Thomas found that this evidence was consistent with the *Rutledge* requirement that "one means of wrongful concealment of an ongoing antitrust conspiracy is a co-conspirator's fraudulent misrepresentations." *Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,044. According to Pinney, this correspondence led Pinney to believe

---

**20.** To the extent that plaintiffs are arguing that the defendants kept their meetings and dealings secret in violation of their statutory duty to issue public notices of meetings, proposals, and rate decisions, it would appear that plaintiffs' argument would involve an interpretation of ICC rules, regulations and statutes. This in turn would seem to implicate the issue of primary jurisdiction, an argument which the defendants also raised in support of their contention that this action should be dismissed, or at least deferred to until the ICC has an opportunity to address the issues. However, Judge Thomas seems to have anticipated this problem because he states: "The present issue is not whether defendants had a statutory duty to disclose to plaintiff the details of their informal discussions. For purposes of the present motion, the court need only decide whether a genuine issue of fact exists as to the alleged agreement and communications being carried out in a manner which eluded discovery by plaintiff." *Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,044.

that Penn Central was acting unilaterally in denying Pinney a line-haul rate and that it was also working to get a commodity iron ore rate established off Pinney's dock.

Sometime in 1968 George Weir, who was fifty percent owner of Pinney, requested from Penn Central a commodity line-haul rate off Pinney Dock equivalent to that which was applied to the railroad owned docks. Penn Central's Wilkins wrote to Weir on September 4, 1968, stating:

> I am informed by our rate people that the subject of publishing rates on pellets originating at private docks on Lake Erie has been considered at a recent meeting of the Coal, Coke & Iron Ore Committee at which time there was a recommendation against extending the application of ex-lake iron ore rates to apply from privately owned docks other than those equipped to handle iron ore from bulk carriers. Under the circumstances, Penn Central must be governed by this recommendation.

*Id.* at 69,045. On October 3, 1968, Weir responded to this letter by stating that he was "still le[ft] . . . in the dark because you have not given me the justification on which this recommendation was supposedly based." *Id.*

Funkhouser, who was also an executive of Penn Central, responded to this letter by explaining that the basic reason for Penn Central's refusal to publish ex-lake rates from the Pinney Dock was that it would be financially unsound to do so:

> [T]he Coal, Coke, and Iron Ore Committee of the Eastern Railroads has recommended against extending the application of ex-lake iron ore rates from additional docks. Traditionally, rates have been confined to apply from a relatively few docks from which ore moves in large and steady volume. . . . This had been advantageous to the shipping public and to the railroads. It seems clear that to depart

from this scheme . . . would be damaging both to the railroads and to the iron ore shippers.[21]
*Id.*

On March 28, 1969, Weir made a further request that Penn Central extend its ex-lake iron ore rates to Pinney Dock, to which Funkhouser again responded: "It seems clear that to depart from this scheme of transportation by making the ex-lake iron ore rates applicable on spasmodic shipments from what would unquestionably grow to be a sizeable number of small docks would be at variance with the concept underlying said rates and would be damaging both to the railroads and to the iron ore shippers." *Id.*

Pinney argued before the district court that this correspondence led Pinney to believe that the reason why Penn Central was unwilling to publish a rate was its unilateral concern about Pinney's ability to meet volume requirements. According to Pinney, as late as August 19, 1974, Penn Central continued informing Pinney "that the level of ex-lake ore rates was constructed on a volume basis and the extensions of these rate[s] to facilities which could load only relatively small amounts of ore would make the rates unrealistic." *Id.* Although the defendants attempted to argue before the district court that this correspondence, rather than misrepresenting its actions, actually disclosed both to Pinney and to the ICC that its refusal to extend a commodity rate to Pinney was related to efficiency considerations, Judge Thomas nevertheless concluded that a genuine issue of fact existed as to whether the defendants had misrepresented their reasons for denying the rate to Pinney. According to Judge Thomas:

> The inference drawn by defendants can properly be argued to the trier of fact. However, the evidence, read in a light most favorable to Pinney, does not

**21.** Notwithstanding this apparently valid explanation for Penn Central's refusal to extend an ex-lake rate from Pinney Dock, the district court concluded that "[t]he trier of fact could find from the documents in the record that the true justification for the 'recommendation against extending the application of ex-lake iron ore rates from privately-owned docks other than those equipped to handle iron ore from bulk carriers' was the continuing secret agreement of February 26, 1958, to deny an iron ore commodity rate from Pinney's dock." *Pinney Dock,* 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,045.

as a matter of law show that defendants were open and honest with Pinney as to the reasons Pinney was denied a commodity rate. A genuine issue of fact exists as to whether Penn Central misrepresented the reasons for its actions so as to conceal the alleged conspiracy.

*Id.* at 69,046.

Thus, Pinney initially alleges that the reasons why the defendants denied it a line-haul commodity rate was in order to effect the conspiracy to drive self-unloaders off Lake Erie. The defendants then brought forth evidence in the form of memoranda and correspondence that the reason they denied Pinney such rates was due to a concern with Pinney's low volume.

The final instance of affirmative acts of concealment discussed by the district court involves certain memoranda and correspondence between Pinney Dock and Penn Central during the period of 1973 to 1975. Based on these documents Pinney Dock argued before the district court that "Penn Central periodically misled Pinney into believing that it was ready, willing and able to do business with it. The effect of such misrepresentations was to leave Pinney with the clear impression that Penn Central could, and might, change its mind on rates from Pinney at any moment." *Id.* at 69,-046. As the district court noted, Pinney pointed to communications it had with George Wallace of Penn Central in 1970 about granting Pinney a rate. "Several Wallace letters to Pinney indicate that Penn Central was 'glad to discuss ... the question of a modern rail loading facility to be built by [Pinney],' a facility which Penn Central might use in return for issuing an ex-lake iron ore rate from Pinney Dock. Yet, other exhibits show that during this same period, Mr. Wallace was actively participating in meetings and discussions with other railroads on how to limit the use of self-unloaders." *Id.*

As further evidence of misrepresentations by the defendants during the 1973–1975 period, the district court pointed to the deposition of Maynard Walker, president of Pinney Dock, who testified that:

Jim Royston at one time said to me, "Don't worry," he said to me and Joe Del Priore, "Don't worry, boys, Uncle Jim will take care of you."

*Id.* The district court also noted that in an internal memorandum of October 1, 1975, which was prepared by Royston of Penn Central it was stated that:

Pinney was reassured that our modification plans for Ashtabula included serious consideration of including Pinney Dock in, or as an adjunct to the consolidated A & B and Union Docks.

*Id.*

Finally, the district court noted that Pinney presented evidence to show that Royston may have been intentionally misleading Pinney. For example, a former Penn Central employee testified in a special proceeding that:

I was told to meet with Mr. Royston up at Pinney Dock to discuss it. Pinney Dock had offered to pay the entire cost of this conveyor system that would traverse from Pinney Dock over the Union fence tracks. After the meeting we went back. I discussed it with Mr. Ward, and I discussed it with Mr. Royston. Mr. Royston said that it was a lesson in futility, that we were just trying to appease Pinney Dock and keep them quiet. He said Pinney Dock would never get into the Ashtabula switching district, and it would be over his dead body before it got there. Those were the exact words used.

*Id.* According to Judge Thomas, "[t]hese letters and statements of Penn Central in the 1970's would permit the trier of fact to find that Penn Central affirmatively misled Pinney into believing that it was willing to 'take care' of Pinney Dock's iron ore requests." *Id.*

The defendants argue in their brief that both of these conclusions by the district court should be rejected because the evidence in the record as a whole establishes as a matter of law that Pinney's purported reliance on Penn Central's representations was not "reasonable." *See Rutledge v. Boston Woven Hose & Rubber Co.*, 576

F.2d at 250. In support of this argument, the defendants claim:

As early as August 31, 1971, Mr. Walker, Pinney's president, stated that he expected Penn Central to "say 'no' to our rate request or, at the least, attempt to stall us, as they had been doing in the past." On October 7, 1971, Mr. Walker again stated his belief that "Penn Central and the B & O/C & O do not want a private dock with lower handling rates in the picture during this time period, which could well be 5/10 years, due to the effect this new rate would have on existing handling rates of their lessees and possibly themselves." On February 4, 1972, Mr. Walker wrote to Pinney's legal counsel, Mr. Beery, that it "does appear that we will not obtain the iron ore rate from Penn Central on a friendly basis," to which Beery on February 10, 1972 responded that "the present combination will last for at least another decade."

As described above, in 1968 and 1969, when Pinney asked Penn Central for a line-haul rate, Penn Central refused. Penn Central explained that it was following a recommendation made at a CCIOC meeting and that the reason for the refusal was that the interest of the railroads and the iron ore shippers was to restrict line-haul rates to a few docks from which ore moved in large and steady volume. However, Pinney's Mr. Weir testified in a deposition that he did not believe that Penn Central was governed by the CCIOC recommendation, because he "knew that the Penn Central had the right" to act independently of the CCIOC. *Pinney Dock*, 1983–2 Trade Cas. (CCH) ¶ 65,608 at 69,049. Weir also testified that he believed the reason that Penn Central gave for the recommendation: "Being a traffic man, I could conceive of no other reason [for Penn Central denying a commodity rate] than that they had some reservations as to whether we could handle the minimum tonnage required on this iron ore rate." *Id.* at 69,049 n. 16.

In denying summary judgment, the district court stated that it was unclear whether Weir should have known that Penn Central had submitted to the CCIOC recommendation. The judge stated that "the tri-

er of fact may infer ... that Weir was warranted" in doubting that Penn Central had surrendered its right of independent action. *Id.* Also, the court ruled that Penn Central's report of the CCIOC recommendation "did not as a matter of law inform Pinney of the existence of the alleged railroad conspiracy." *Id.* at 69,050.

We have, as did the district judge, reviewed the evidence concerning the relationship of the parties quite thoroughly. We conclude that it may contain the seeds of support for the finding of the district judge that a factual question of actual concealment was presented. However, we also conclude that the record leads us to the same conclusion reached by Judge McCree in *Gaetzi*, namely that the time eventually arrived when "the alleged conspiracy was no longer concealed and could have been discovered by due diligence well within the statutory period for bringing suit." *Gaetzi*, 205 F.Supp. at 623.

In August 1970 Beery wrote a file memo that was a record of his meeting with Weir and Pinney's president, Walker. The memo said: "It appears that we have an antitrust action.... I advised that I had no knowledge as to antitrust actions but that I would obtain and consult the services of someone who is knowledgeable." Walker's desk calendar contains a notation referring to the meeting: "Will sue [Penn Central] under antitrust laws...." A memo by Weir also mentions the possibility "of filing an antitrust action."

In September 1971 Beery wrote to Walker:

[Y]ou should consider the formal complaint to the Interstate Commerce Commission possibly followed by an anti-trust action against Penn Central. It would appear that the first action taken must be to the Interstate Commerce Commission, as that agency has the jurisdiction of the dispute.

\* \* \* \* \* \*

We are considering coupling any administrative action with some widely based investigation of the conditions now prevailing upon the Great Lakes in rela-

tion to the unloading of iron ore and the monopolistic conditions there that may significantly affect the public.

In February 1972 Beery wrote Walker a letter strongly urging that Pinney fight Penn Central under the antitrust and interstate commerce laws. This four-page letter contained only one legal argument: "If you can show that the self-unloader vessel will only be built after the rates are established for this type of unloader, then you can show that you are being damaged by Penn Central's refusal to publish competitive rates." The rest of the letter emphasized the business advantages to Pinney Dock of fighting. The tone of the letter is captured in its final sentence: "We can provide the technical means with which to fight this combination, but you have to provide the spirit and the perseverance." In a postscript Beery offered to go to Pinney Dock's office the next month to discuss "possible solutions and alternatives."

In January 1973 Walker responded that he thought that legal action "would be a waste of time and money," that he preferred to wait until Pinney had more self-unloader capacity, and that it would not harm Pinney to "delay court action" until then.

In holding that there is an issue of fact as to whether Pinney knew of its cause of action, the district court relied on Walker's testimony that Beery "didn't know what he was saying" about monopolistic conditions and on Beery's testimony that he was not familiar enough with the federal antitrust laws to understand what "monopoly" means under them. *Pinney Dock*, 1983–2 Trade Cas. (CCH) at 69,051. Defendants argued in the district court that if Pinney had been diligent, Beery's advice would have at least prompted the filing of an antitrust action, which "would have provided broad-based discovery of the detailed facts now alleged by Pinney." The court rejected the notion that obtaining discovery would have been a proper motive for filing an antitrust action. *Id.* at 69,055. This observation may in itself have been correct, but it has little relevancy to the realistic question of concealment. The knowledge

that the railroads were acting in concert through their joint rate-making activities and any plain understanding of their self-interest was, in our opinion, bound to dispel any uncertainty as to their motive in failing to publish competitive rates. To hold that a tolling or suspension of the limitation of actions must continue unless or until proof positive existed of a wrong (which might never be established in fact) would abort the policy of the law of repose in statutes of limitations of diligence in the equitable principles permitting suspension of them. The plaintiffs are therefore limited in their remaining causes of action to acts and damages occurring within the statutory four year period preceding the filing of their action.

### b. Affirmative Acts of Concealment of Litton's Cause of Action

■ The district court ruled that there also existed an issue of fact whether the Chesapeake & Ohio and Baltimore & Ohio Railroad Companies (C & O/B & O) created a false impression that they were willing to lease dock facilities to Litton.

The district court based its ruling on evidence of a meeting on April 30, 1971 between Litton's president, Preisser, and C & O/B & O's vice president, Sandmann. Before the meeting, Sandmann said in an internal memo that he planned to tell Preisser that C & O/B & O was willing to negotiate for the rental of "the so-called Grove Storage area." Sandmann also stated in the memo:

A lease to Litton would, in effect, create a private dock, and the ore could conceivably be trucked ... to inland mills. The railroad would lose control of the property. Other efforts have been made over the years to establish such private docks along Lake Erie and have been successfully resisted by the railroads.

Defendants argue that the ruling below was wrong, because the district court did not cite evidence that the railroad's expressions of interest in leasing were false or purposely misleading. As for Sandmann's statements that the railroad feared that a lease would allow Litton to "create a private dock" and that the railroads had in the

past "successfully resisted" attempts to create such private docks, defendants argue that such statements "merely recognized one disadvantage of arranging a lease."

The district court also based its holding on a letter that Litton received from Penn Central on March 19, 1971. Penn Central had filed a proposal with the CCIOC to establish a charge of $1.41 a ton for handling ore from self-unloading vessels. Litton protested what it described as an increase over the current rate of $.41 a ton. Penn Central responded in the March 19 letter that that rate of $.41 had never applied to self-unloaders. Penn Central closed the letter with the statement that the district court read as evidence of misrepresentation:

> As I have indicated to your Company before, we are ready at any time to join with you in attempting to improve the facilities and resolve the cost problems involved in lake-rail movements of iron ore and pellets.

Defendants argue that this "conclusory expression of good will cannot, without more, constitute evidence of active concealment of the alleged railroad conspiracy." We are compelled to agree. No reasonable person could read this letter in its context as anything other than a stiff rebuff of Litton's protest.

Further, defendants argue that the record shows that Litton was not misled by Penn Central's expression of good will. We agree. It was error to conclude otherwise upon this record.

The district court ruled that there existed a question of fact as to whether Litton knew of the facts constituting its cause of action before the statute of limitations expired. Some of the evidence at issue concerns the railroads' setting handling charges together. In March 1970 one Andberg, the president of a Litton subsidiary, told Preisser that the "[r]ailroads are meeting next week to discuss rate and future position." In an undated letter, Andberg said that he was told that Litton "could have difficulties with the railroads banding against [it]." Also, Andberg testified in a deposition that "it was common knowledge to me before I ever went to work for Wilson [the Litton subsidiary] that the railroads didn't want self-unloaders delivering iron ore." *Id.* Preisser knew that Sandmann, before their meeting on April 30, 1971, was planning to meet with other railroads "to discuss their terminal strategy on the Great Lakes and the relationship of that strategy to the new jumbo self-unloaders." In the same file memorandum Preisser described another conversation in which he had said that "we would not like the idea of the railroads colluding and/or meeting to determine their strategy on lake transfer terminals."

Andberg gave the following testimony in a deposition. When he was told that the railroads were banding against Litton, he "didn't know really" what that meant. He was aware of the rate bureau meetings but he "was not aware that they had meetings after their rate meetings and collectively got together" to make decisions directed against Litton. Preisser testified similarly:

> There were ... ratemaking bureaus and rate filings which were published; and I presumed if they were having a meeting and they were going to discuss rates, they would do so in, you know, the proper form, whether it was at rate bureau meetings or public filing of a rate change or decision.

The district court held that there was an issue of fact as to whether Litton knew that the railroads acted collectively apart from rate bureau meetings.

On April 30, 1971 Sandmann told Preisser that C & O/B & O would not give Litton a lower handling charge for self-unloaders. After the meeting Preisser said that Sandmann "was intimidated by the other railroads and capitulated. He will not offer us an advantageous rate over their existing docks." In June 1971 Andberg was told that if C & O/B & O reduced its charges, "Penn Central would equalize. This would start a rate war."

Preisser testified about what he meant by his comment that Sandmann was intimidated:

[H]e may have been intimidated by the other railroads' financial power, their responsiveness, their engineering, their car fleet size, the rapidity with which they could move and update their docks, arrangements which they might proceed to enter into with American Ship Building or some other Lake transportation carrier.

Plaintiffs argued in the district court that when they heard that Penn Central would match any reduction in C & O/B & O's handling charges, plaintiffs thought this meant that the railroads were willing to compete with each other, not that they were conspiring against Litton.

The district court held that Litton indeed might have understood Penn Central's threat "as a sign of competition and not collusion." As for the meeting in which Sandmann succumbed to the other railroads' pressure, the court stated:

> Even if plaintiffs knew that defendants met *privately* on April 29, this is not as a matter of law the equivalent of plaintiffs having knowledge that defendants had previously entered into and were furthering their alleged conspiracy to restrain the use and development of self-unloaders. Further, it may be found, as Preisser testified, that when he stated Sandmann was "intimidated" by the April 29 meeting, Preisser was referring to natural economic pressures rather than pressure resulting from a conspiracy. . . .

When Preisser became aware of Sandmann's meeting with the other railroads on April 29, 1971, Preisser knew in defendants' words "that the defendants were acting jointly to Litton's detriment with respect to handling charges," and should have suspected and investigated a possible conspiracy. As we have described above, on April 30, 1971 Sandmann and Preisser discussed C & O/B & O's handling charges and the possibility of Litton's leasing C & O/B & O dock facilities. The district court held that this meeting and other negotiations continuing through mid–1972 may have reasonably deterred Litton from investigating any suspicion of a conspiracy.

Once again our review of the evidence satisfies us that even if the defendants might conceivably have misled Litton initially, no reasonable person in the position of Litton could have long relied on such impressions nor have been dissuaded from exercising due diligence in investigating possible antitrust liability within the statutory period.

In conclusion, while we could properly have declined to address the statute of limitations issue upon the basis that a lenient standard of abuse of discretion applies to the denial of motions for summary judgment, we have concluded that the principles of *Alexander v. Aero Lodge*, 565 F.2d 1364, strongly counselled us to reach and decide this issue. There was as much before the district court and before us as there is likely ever to be. And since we conclude that no genuine issue of fact exists to warrant the tolling of the federal four year statute of limitations, the task for the parties and the court will be substantially lessened by our so ruling at this juncture. In short, therefore, the plaintiffs are limited in their proof of federal antitrust violations to conduct occurring within four years of their commencement of action.

As we shall shortly illustrate, we realize that this ruling does not affect plaintiffs' cause of action under the Valentine Act. The impact of our ruling will be summarized in the "conclusion" section of this opinion.

## VII. PREEMPTION OF OHIO'S NO–LIMITATION STATUTE

■ Ohio Revised Code § 1331.12 provides: "No statute of limitation shall prevent or be a bar to any suit or proceeding for any violation of" Ohio's antitrust law, the Valentine Act, Ohio Rev.Code §§ 1331.-01–1331.14. Federal antitrust actions are limited by the four-year period of section 4B of the Clayton Act, 15 U.S.C. § 15b. Plaintiffs appeal the district court's ruling that section 4B preempts application of section 1331.12 to pendent claims that are brought under the Valentine Act and could

be brought under federal antitrust law if not for the statute of limitations.

The standards for deciding a preemption question are well established. State law in a given field can be preempted either entirely or to the extent that it conflicts with federal law. A conflict between state and federal law arises when " 'compliance with both federal and state regulations is a physical impossibliity,' ... or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (citations omitted). *See also Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977).

In the present case there is no suggestion that Congress has preempted the entire field of antitrust regulation or that it is impossible to comply with both federal and Ohio law. The issue, then, is whether Ohio's no-limitation statute "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" in enacting a four-year statute of limitations.

Before the enactment of section 4B of the Clayton Act in 1955, there was no federal statute of limitations for antitrust claims, and courts borrowed analogous state limitation periods and applied them to federal claims. *See Chattanooga Foundry & Pipeworks v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). When Congress was considering the proposed section 4B, twenty-two of the forty-eight states were applying limitations periods of over four years. *See* S.Rep. No. 619, 84th Cong., 1st Sess., *reprinted in* 1955 U.S. Cong. & Admin.News 2328, 2331–32. Some states had enacted their own antitrust laws by then, and Congress presumably knew that courts might continue to apply statutes of limitation longer than four years to state claims. Congress' silence in the face of this possibility can be seen as acquiescence.

Ohio's no-limitation provision was itself in effect when section 4B was enacted. *See* Act of May 18, 1910, 101 Ohio Laws 274, 276 (1910). We cannot apply the normal presumption that Congress knew of the existence of the provision, *see New York State Dept. of Social Services v. Dublino*, 413 U.S. 405, 414, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973), because in fact Congress did not know of it. In 1952 a United States district judge in the Northern District of Ohio, ignoring the no-limitation provision, held that federal antitrust claims were governed by Ohio's six-year limitation on actions to enforce a liability created by statute. *See Reid v. Doubleday & Co.*, 109 F.Supp. 354 (N.D.Ohio 1952). The Senate Report, *supra*, at 2331, cited this case as the source for the Ohio statute of limitations applicable to antitrust claims and did not cite the Valentine Act.

One apparent reason for enacting section 4B of the Clayton Act was that Congress at the same time enacted section 4A, 15 U.S.C. § 15a, which provides for antitrust damages actions by the United States. *See* Act of July 7, 1955, Pub.L. 84–137, 69 Stat. 282 (1955). These actions are also subject to the limitation period in section 4B. 15 U.S.C. § 15b. In allowing the federal government to sue for damages, Congress had good reasons to set a federal statute of limitations. If Congress had not set a federal statute of limitations, damage suits by the federal government would have been hampered in states having a limitation period of less than four years. Furthermore, it would look unfair for the federal government to sue one party and not another, when the conduct of both violated federal antitrust law but they operated in different states. Thus, enforcement of federal law would have justified enacting section 4B and leaving state limitation periods intact.

There are indications, however, that Congress might have intended to preempt state statutes of limitation. The Senate Report noted the following problems that inconsistent statutes cause:

(1) Plaintiffs in different states injured by the same interstate conduct do not have the same opportunities to recover.

(2) The plaintiff can shop for the forum with the longest statute of limitations, and "the defendant remains in constant jeopar-

dy until the longest period of limitations has transpired."

(3) When there is a choice between two states' statutes of limitation, the question of which state's law applies—that of the forum or that of the situs of the injury—creates confusion.

After setting out these problems, the Senate Report stated: "It is one of the primary purposes of this bill to put an end to the confusion and discrimination present under existing law...." Senate Report, *supra,* at 2331.

The main reason for the district court's decision was that if state statutes of limitation are not preempted—a question that has arisen only recently and only in regard to Ohio, *see Ohio ex rel. Brown v. Klosterman French Baking Co.,* 1977–1 Trade Cas. (CCH) ¶ 61,361 (S.D.Ohio 1976)—the confusion in choice of law may return along with differences in defendants' exposure time and plaintiffs' ability to recover.

We have very carefully considered the trial court's conclusion that Ohio's antitrust law, as provided under the Valentine Act, should be subject to the federal four-year limitation period notwithstanding Ohio's provision that no statute of limitation should be a bar to any proceeding for the violation of its antitrust law. The trial judge's ruling is appealing in many respects. Although we recognize the disadvantages which must inherently exist in a statute which is subject to no limitation, we are not convinced that the correct result was reached below.

Congress primarily focused on limiting federal antitrust actions. It was concerned that private enforcement of federal rights would be subject to a wide variety of state borrowing statutes. Congress was even more intent upon limiting the enforcement powers of the federal government itself. The establishment of a federal statute of limitations eliminated the possibility that federal enforcement would vary with the law of the jurisdiction in which the cause of action arose. We believe this is what the Senate Report was primarily addressing. Since Congress was well aware that there were state antitrust laws in effect and

chose not to preempt them, we believe that neither did it intend to preempt anything in them, including statutes of limitations or provisions excluding them. We make no comment, of course, on what other constitutional, statutory or common law inhibitions there may be under Ohio law which might act as a bar to keeping such actions open in perpetuity. In short, to the extent to which the district court has pendent jurisdiction to adjudicate the rights of the parties under the Valentine Act, we hold that the four-year federal statute of limitations does not preempt Ohio Revised Code § 1331.12.

### CONCLUSION

We harbor no illusions that we have resolved all of the problems which face the parties and the court in this extended litigation. Given the nature of the many rulings and the vagueness of the certification procedure employed both by the district court and by our court, we are not even certain that we have addressed all of the issues which arguably may have been included in the certification. To the extent the trial court and the parties are unable to glean any resolution of those unresolved questions that may have been certified, those questions are decertified.

Summarizing what we have reached here and decided on interlocutory appeal, we hold as follows:

(1) With regard to immunity under *Keogh* and under the Interstate Commerce Act all rate-related claims made by the plaintiffs, whether state or federal, must be dismissed.

(2) Following *Square D* and its disposition by the Supreme Court on remand, certain non-rate-related claims must survive, at least at this stage, and are therefore remanded to the district court for further proceedings, as follows:

(a) the claim that the defendants refused to permit Litton to purchase, lease or use dock facilities that could take self-unloaders;

(b) the claim that defendants used harassing tactics to try to forestall legitimate

business activities of competitors [to the extent that this claim is not rate-related];

(c) the claim that defendants refused to handle self-unloading vessels at defendants' docks;

(d) plaintiffs' claim that defendants boycotted Pinney;

(e) the claim that defendants divided markets; and

(f) any other non-rate claim that plaintiffs might make by amendments, subject always of course to the exercise of its discretion in that regard by the trial court.

(3) With respect to standing, all rate-related claims except for Pinney's claim that defendants did not grant it a commodity line-haul rate, which were not raised on appeal, again are subject to dismissal on the alternate basis of standing. Further, claims (a) and (c), referring to the defendants' refusal to permit Litton to purchase, lease or use dock facilities and the defendants' refusal to handle self-unloading vessels at their own docks, are dismissed as to Pinney Dock in their entirety.

(4) The federal four-year statute bars all claims under federal law that occurred four years before the lawsuit was commenced. Plaintiffs' claim in that regard that accrual of the cause of action was tolled by fraudulent concealment is rejected because if in fact concealed, any such causes of action were nonetheless discovered or could with reasonable diligence have been discovered notwithstanding such a concealment and well within the appropriate time for commencing such actions. We do not hold that all claims are time-barred and the defendants' motion to dismiss on that has not sought such relief.

(5) The provision in Ohio's Valentine Act providing for no statute of limitations is not preempted by the federal four-year statute.

(6) All issues not otherwise addressed in this opinion are decertified and the case is remanded to the district court for further proceedings consistent herewith.